# EXHIBIT A

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

<div style="border">
FOR COURT USE ONLY<br>
*(SOLO PARA USO DE LA CORTE)*

**Electronically FILED by
Superior Court of California,
County of Los Angeles
4/23/2024 1:31 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By T. Valdez, Deputy Clerk**
</div>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co.
(Additional Parties Attachment form is attached)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through the Los Angeles City Attorney and, the CITY OF LOS ANGELES

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Sup. Ct. of Cal., County of Los Angeles

312 North Spring St., Los Angeles, California 90012

| CASE NUMBER: |
|---|
| *(Número del Caso):* |
| 24STCV099399 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Matthew J. Preusch, Keller Rohrback L.L.P., 801 Garden Street, Suite 301, Santa Barbara, CA 93101, (805) 456-1496

DATE: 04/23/2024          Clerk, by _____T. Valdez_____, Deputy
*(Fecha)*  David W. Slayton, Executive Officer/Clerk of Court  *(Secretario)*          *(Adjunto)*
(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*
   Tyco Fire Products, LP, individually and as successor in interest
3. [X] on behalf of *(specify):* to the Ansul Company

   under: [ ] CCP 416.10 (corporation)          [ ] CCP 416.60 (minor)
   [ ] CCP 416.20 (defunct corporation)          [ ] CCP 416.70 (conservatee)
   [X] CCP 416.40 (association or partnership)    [ ] CCP 416.90 (authorized person)
   [X] other *(specify):* Successor
4. [ ] by personal delivery on *(date):*

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

SUM-200(A)

| SHORT TITLE:<br>The People of the State of California, et al. v. 3M Company, et al. | CASE NUMBER:<br>24STCV099399 |
|---|---|

## INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff   ☒ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

AGC CHEMICALS AMERICAS, INC.;
ARKEMA INC.;
ARCHROMA U.S., INC.;
BASF CORPORATION, individually and as successor in interest to Ciba Inc.;
BUCKEYE FIRE EQUIPMENT COMPANY;
CARRIER FIRE & SECURITY AMERICAS CORPORATION, f/k/a UTC Fire & Security Americas Corporation;
CARRIER FIRE & SECURITY CORPORATION, f/k/a UTC Fire & Security Corporation;
CARRIER GLOBAL CORPORATION;
CHEMDESIGN PRODUCTS INC.;
CHEMGUARD INC.;
CHEMICALS INCORPORATED;
THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise;
THE CHEMOURS COMPANY FC, LLC, individually and as successor in interest to DuPont Chemical Solutions Enterprise;
CLARIANT CORPORATION, individually and as successor in interest to Sandoz Chemical Corporation;
CORTEVA, INC., individually and as successor in interest to DuPont Chemical Solutions Enterprise;
DEEPWATER CHEMICALS, INC.;
DUPONT DE NEMOURS INC., individually and as successor in interest to DuPont Chemical Solutions Enterprise;
DYNAX CORPORATION;
NATION FORD CHEMICAL COMPANY;
NATIONAL FOAM, INC.;
E. I. DUPONT DE NEMOURS AND COMPANY N/K/A EIDP, INC., individually and as successor in interest to DuPont Chemical Solutions Enterprise;
TYCO FIRE PRODUCTS, LP, individually and as successor in interest to The Ansul Company and;
JOHN DOE DEFENDANTS 1–20,

Page __2__ of __2__

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

1
HYDEE FELDSTEIN SOTO, City Attorney
KATHLEEN A. KENEALY, Chief Asst. City Attorney (SBN 212289)
2
MICHAEL J. BOSTROM, Senior Asst. City Attorney (SBN 211778)
3
JESSICA BROWN, Asst. City Attorney (SBN 211642)
**OFFICE OF THE LOS ANGELES CITY ATTORNEY**
4
201 N. Figueroa Street, Suite 1300
Los Angeles, CA 90012
5
Telephone: (213) 978-1867
michael.bostrom@lacity.org
6

7
*Attorneys for Plaintiffs,*
*The People of the State of California and*
8
*the City of Los Angeles*

**Electronically FILED by**
Superior Court of California,
County of Los Angeles
4/19/2024 2:09 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By J. Covarrubias, Deputy Clerk

**[NO FEE – Cal. Gov't Code § 6103]**

9
***Additional Counsel Listed on Signature Page***

10
**SUPERIOR COURT OF THE STATE OF CALIFORNIA**
11
**COUNTY OF LOS ANGELES**

12
THE PEOPLE OF THE STATE OF CALIFORNIA,
acting by and through the Los Angeles City
13
Attorney and,
the CITY OF LOS ANGELES,
14

Case No. 24STCV09939

**COMPLAINT FOR ABATEMENT,**
**EQUITABLE RELIEF, AND DAMAGES**

15
*Plaintiffs,*

**JURY TRIAL DEMANDED**

16
- *vs* -

17
3M COMPANY, f/k/a Minnesota Mining and
Manufacturing Co.;
18
AGC CHEMICALS AMERICAS, INC.;
19
ARKEMA INC.;
ARCHROMA U.S., INC.;
20
BASF CORPORATION, individually and as
successor in interest to Ciba Inc.;
21
BUCKEYE FIRE EQUIPMENT COMPANY;
22
CARRIER FIRE & SECURITY AMERICAS
CORPORATION, f/k/a UTC Fire & Security
23
Americas Corporation;
CARRIER FIRE & SECURITY CORPORATION,
24
f/k/a UTC Fire & Security Corporation;
CARRIER GLOBAL CORPORATION;
25
CHEMDESIGN PRODUCTS INC.;
26
CHEMGUARD INC.;
CHEMICALS INCORPORATED;
27
THE CHEMOURS COMPANY, individually and as
successor in interest to DuPont Chemical Solutions
28
Enterprise;

COMPLAINT

1    THE CHEMOURS COMPANY FC, LLC,
     individually and as successor in interest to DuPont
2    Chemical Solutions Enterprise;
     CLARIANT CORPORATION, individually and as
3    successor in interest to Sandoz Chemical
     Corporation;
4    CORTEVA, INC., individually and as successor in
     interest to DuPont Chemical Solutions Enterprise;
5    DEEPWATER CHEMICALS, INC.;
     DUPONT DE NEMOURS INC., individually and as
6    successor in interest to DuPont Chemical Solutions
     Enterprise;
7    DYNAX CORPORATION;
     NATION FORD CHEMICAL COMPANY;
8    NATIONAL FOAM, INC.;
     E. I. DUPONT DE NEMOURS AND COMPANY
9    N/K/A EIDP, INC., individually and as successor in
     interest to DuPont Chemical Solutions Enterprise;
10   TYCO FIRE PRODUCTS, LP, individually and as
     successor in interest to The Ansul Company and;
11   JOHN DOE DEFENDANTS 1–20,

12                    *Defendants.*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

COMPLAINT                                    2

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................1

II.   JURISDICTION ................................................................................................3

III.  PARTIES ..........................................................................................................3

    A.    Plaintiffs ..................................................................................................3

    B.    Defendants ...............................................................................................4

        1.    The AFFF Defendants ...................................................................4

        2.    The Fluorosurfactant Defendants ...............................................9

        3.    The Fluorochemical Defendants ...............................................13

IV.   FACTUAL ALLEGATIONS ..........................................................................16

    A.    1940s–1950s: 3M, DuPont, and the Development of a Toxic Chemical
        Family ....................................................................................................16

    B.    1960s: The Introduction of AFFF..........................................................20

    C.    1970s–1980s: Defendants' Deepening Knowledge of the Risks of PFOA
        and PFOS................................................................................................21

    D.    1990s–2000s: With 3M and DuPont Under Scrutiny, the AFFF Market
        Shifts to Telomerization. ........................................................................26

    E.    The DuPont Defendants' Fraudulent Transfers.....................................31

    F.    Defendants Hid What They Knew from the Government and the Public....................34

    G.    Federal, State, and International Government Agencies Call for
        Monitoring and Remediation of PFAS Contamination...........................36

    H.    The State of California's PFAS Regulatory Response .............................42

    I.    Regulation of AFFF at Airports by the FAA..........................................44

    J.    AFFF Containing PFOS and PFOA Is Fungible and Commingled in the
        Groundwater. ..........................................................................................47

i

COMPLAINT

K.     Defendants' AFFF/PFAS-Containing Products have caused, and continue to cause, widespread PFAS Contamination in and around Los Angeles. ....................47

1.    The City's Public Water Supply System .........................................49

2.    The City's Wastewater and Stormwater Systems ..........................52

3.    Airport Properties ...........................................................................54

V.    MARKET SHARE LIABILITY, ALTERNATIVE LIABILITY, CONCERT OF ACTION, AND ENTERPRISE LIABILITY ........................................................58

VI.    CAUSES OF ACTION..............................................................................................58

FIRST CAUSE OF ACTION Public Nuisance—Abatement (Against the AFFF Defendants, the DuPont Defendants, and Dynax) ........................................58

SECOND CAUSE OF ACTION Public Nuisance—Damages (Against the AFFF Defendants, the DuPont Defendants, and Dynax) ........................................62

THIRD CAUSE OF ACTION Negligence (Against the AFFF Defendants, the DuPont Defendants, and Dynax) ........................................................................64

FOURTH CAUSE OF ACTION Defective Design—Strict Products Liability (Against all Defendants)........................................................................................69

FIFTH CAUSE OF ACTION Failure to Warn—Strict Products Liability (Against all Defendants)..........................................................................................72

SIXTH CAUSE OF ACTION Fraudulent Transfer (Against the DuPont Defendants)..............................................................................................................74

A.     Actual Fraudulent Transfer (Cal. Civ. Code § 3439.04(a)(1)) .....................76

B.     Constructive Fraudulent Transfer (Cal. Civ. Code § 3439.04(b)(5)) ..........78

REQUEST FOR RELIEF........................................................................................................80

DEMAND FOR JURY TRIAL ..............................................................................................82

ii

COMPLAINT

# COMPLAINT

The People of the State of California, acting by and through Hydee Feldstein Soto, the Los Angeles City Attorney, and the City of Los Angeles hereby file this Complaint against Defendants 3M Company, f/k/a Minnesota Mining and Manufacturing Co., AGC Chemicals Americas Inc., Arkema Inc., Archroma U.S. Inc., BASF Corporation, Buckeye Fire Equipment Company, Carrier Fire & Security Americas Corporation, Carrier Fire & Security Corporation, Carrier Global Corporation, ChemDesign Products Inc., Chemguard Inc., Chemicals Incorporated, The Chemours Company, The Chemours Company FC, LLC, Clariant Corporation, Corteva, Inc., Deepwater Chemicals, Inc., DuPont de Nemours Inc., Dynax Corporation, E. I. du Pont de Nemours and Company, Nation Ford Chemical Company, National Foam, Inc., and Tyco Fire Products, LP, and Doe Defendants 1–20, fictitious names whose present identifies are unknown (collectively, "Defendants") and allege, upon information and belief, as follows:

## I.    INTRODUCTION

1.      Per- and polyfluoroalkyl substances (collectively, "PFAS") are a class of highly toxic "forever" chemicals that persist in the environment indefinitely. These chemicals are human-made and do not occur naturally in the environment. PFAS are dangerous to human health and the environment even at fleetingly low levels because these compounds bioaccumulate and biomagnify in human and animal tissues. PFAS exposure interferes with human immune system functioning, disrupts mammalian reproductive and endocrine systems, and is associated with increased risks of kidney and testicular cancer. In addition to being highly toxic, these "forever chemicals" are highly mobile. When they enter the environment, they can travel through soil and eventually work their way into groundwater and surface water, where they can contaminate drinking water sources and enter the food chain.

2.      Two of the most commonly used PFAS are perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonate ("PFOS"). For many decades, PFOA was used in the manufacturing of

1

DuPont's non-stick coating, Teflon. Another common use of both PFOA and PFOS is as a component of a fire-suppressant material called aqueous film-forming foam ("AFFF").

3.      AFFF is used in training and firefighting activities for fighting liquid-based fires, including those involving jet fuel, gasoline, or other fuels. Until recently, the Federal Aviation Administration ("FAA") mandated AFFF to be used at commercial airports. When used in firefighting training, emergency response activities, and federally mandated testing of firefighting equipment, AFFF is sprayed over structures and onto the ground. In other words, AFFF directly enters the environment from its intended use.

4.      Like fluorine-free firefighting foam, AFFF contains water, solvents, and hydrocarbon surfactants. A surfactant is a chemical compound that acts to break up the surface tension between two materials; in the context of firefighting foam, surfactants allow the foam to spread over the material fueling the fire, thus blanketing and extinguishing the fire. In AFFF, however, the surfactants used contain a perfluoroalkyl group (i.e., PFAS). These surfactants containing PFAS are referred to as fluorosurfactants.

5.      At various times from the 1950s through today, Defendants designed, formulated, manufactured, marketed, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of: (a) PFAS; (b) the chemical precursors of PFAS; (c) AFFF products containing PFOS, PFOA, and/or their chemical precursors, (d) fluorosurfactants and/or poly- and perfluorinated chemicals contained in AFFF; and/or (e) products—including but not limited to industrial, commercial and consumer products—containing PFAS and/or the chemical precursors of PFAS (collectively, "PFAS-Containing Products").

6.      Defendants designed, manufactured, marketed, distributed, and/or sold AFFF/PFAS-Containing Products despite knowing that PFAS are toxic, persist indefinitely, and would be routinely

2

COMPLAINT

released into the environment during their intended uses, such as in firefighting training, emergency response activities, and federally mandated testing of firefighting equipment, even when used as directed and intended by Defendants.

7.     Like numerous other communities across the country, the City of Los Angeles is now grappling with the problem of PFAS contamination, in part from AFFF use. Defendants, with their extensive knowledge of the properties and risks of PFAS, had all the information necessary to know that their products would contaminate the environment. PFAS cleanup is difficult, expensive, and will take years to complete. Defendants, who continued to manufacture and sell these chemicals for decades despite their knowledge, should pay to help clean up the mess that they created.

## II.     JURISDICTION

8.     The Superior Court has original jurisdiction over this action pursuant to Article VI, Section 10 of the California Constitution.

9.     The Superior Court has personal jurisdiction over Defendants in this action because Defendants have, among other things, conducted business in this jurisdiction or otherwise availed themselves of the California market, and caused tortious injury in this jurisdiction.

10.     The properties and natural resources that are the subject of this suit all rest within the City of Los Angeles ("Los Angeles") or are under City control or management. No federal subject-matter jurisdiction exists or is invoked herein.

## III.     PARTIES

### A.     Plaintiffs

11.     Plaintiff, the People of the State of California (the "People"), by and through Hydee Feldstein Soto, the Los Angeles City Attorney, prosecute this action pursuant to Code of Civil Procedure

3

COMPLAINT

section 731. The People allege that Defendants have created or assisted in the creation of a public nuisance and seek abatement thereof, including funding future PFAS abatement measures.

12.     Plaintiff, the City of Los Angeles (the "City") is a municipal corporation established pursuant to Article XI, Section 3 of the California Constitution. The City owns and operates drinking water systems, water treatment systems, and water delivery systems, as well as large municipal stormwater and wastewater systems. The City also owns various properties where AFFF has been used, including two airports, the Los Angeles International Airport ("LAX") and Van Nuys Airport ("VNY"), and hangars at Palmdale Airport ("Palmdale Hangars") (collectively, "Airport Properties").

13.     The City also holds in trust, and must preserve for the benefit of the People, certain natural resources. The protection of the City's natural resources from environmental contamination and degradation, and ensuring the health, safety, and welfare of its residents, environment, and economy, are essential public functions of the City.

14.     The City brings this action in its capacity as proprietor of municipal drinking water, stormwater, and wastewater systems, as proprietor of the Airport Properties, as owner or manager of natural resources, and pursuant to its inherent police powers.

15.     The City, together with the People, are referred to collectively as "Plaintiffs."

**B.     Defendants**

16.     The term "Defendants" refers to all Defendants named herein jointly and severally.

**1.     The AFFF Defendants**

17.     The term **"AFFF Defendants"** refers collectively to Defendants 3M Company, Buckeye Fire Equipment Company, Carrier Fire & Security Americas Corporation, Carrier Fire & Security

Corporation, Carrier Global Corporation, Chemguard Inc., National Foam, Inc., and Tyco Fire Products L.P.

18.    **Defendant 3M Company f/k/a Minnesota Mining and Manufacturing Co. ("3M")** is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000.[1]

19.    Beginning before 1970 and until at least 2002, 3M designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to, PFOA and PFOS.

20.    **Defendant Tyco Fire Products LP ("Tyco")** is a limited partnership organized under the laws of the State of Delaware, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143-2542.

21.    Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990.

22.    Beginning in or around 1975, Ansul designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

23.    After Tyco acquired Ansul in 1990, Tyco/Ansul continued to design, manufacture, market, distribute, and sell AFFF products containing PFAS, including but not limited to PFOA and PFOS.

24.    **Defendant Chemguard, Inc. ("Chemguard")** is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143.

---

[1] The City opted out of the settlement between public water systems and Defendant 3M Company in *City of Camden, et al. v. 3M Company*, No. 2:23-cv-3147-RMG (D.S.C.) and *In re Aqueous Film-Forming Foams Products Liability Litigation*, No. 2:18-mn-2873-RMG (D.S.C.) ("AFFF MDL") (Dkt. No. 3620-1, Aug. 28, 2023).

COMPLAINT

25.     On information and belief, Chemguard designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS, including but not limited to PFOA and PFOS.

26.     On information and belief, Chemguard was acquired by Tyco International Ltd. in 2011.

27.     **Defendant Buckeye Fire Equipment Company ("Buckeye")** is a corporation organized under the laws of the State of Ohio, with its principal place of business located at 110 Kings Road, Kings Mountain, North Carolina 28086.

28.     On information and belief, Buckeye designed, manufactured, marketed, distributed, and sold AFFF products containing PFAS, including but not limited to PFOA and PFOS.

29.     **Defendant National Foam, Inc. ("National Foam")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 141 Junny Road, Angier, North Carolina 27501.

30.     Beginning in or around 1973, National Foam designed, manufactured, marketed, distributed, and sold AFFF containing PFAS, including but not limited to PFOA and PFOS.

31.     On information and belief, National Foam currently manufactures the Angus brand of AFFF products.

32.     On information and belief, National Foam merged with Chubb Fire Ltd. to form Chubb National Foam, Inc. in or around 1988.

33.     On information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc. (collectively referred to as "Chubb").

34.     On information and belief, Chubb was acquired by Williams Holdings in 1997.

6

COMPLAINT

35.     On information and belief, Angus Fire Armour Corporation had previously been acquired by Williams Holdings in 1994.

36.     On information and belief, Williams Holdings was demerged into Chubb and Kidde P.L.C. in or around 2000.

37.     On information and belief, when Williams Holdings was demerged, Kidde P.L.C. became the successor in interest to National Foam System, Inc. and Angus Fire Armour Corporation.

38.     On information and belief, Kidde P.L.C. was acquired by United Technologies Corporation in or around 2005.

39.     On information and belief, Angus Fire Armour Corporation and National Foam separated from United Technologies Corporation in or around 2013.

40.     **Defendant Carrier Fire & Security Americas Corporation ("Carrier F&S Americas")** is a corporation organized under the laws of the State of Delaware, with its principal place of business at 13995 Pasteur Blvd, Palm Beach Gardens, Florida 33418-7231.

41.     On information and belief, Kidde-Fenwal, Inc. was an operating subsidiary of Kidde P.L.C. and manufactured AFFF following Kidde P.L.C.'s acquisition by United Technologies Corporation. Kidde-Fenwal, Inc. was also the entity that divested the AFFF business unit now operated by National Foam in 2013.

42.     On May 14, 2023, Kidde-Fenwal, Inc. filed a voluntary petition for relief under chapter 11 of title 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101-1532) in the United States Bankruptcy Court for the District of Delaware.

43.     In its voluntary petition, Kidde-Fenwal, Inc. identified Kidde Fire Protection, Inc., a holding company organized under the laws of the State of Delaware, as its parent company and the owner

1    of 100% of its common stock.

2        44.    On information and belief, Kidde Fire Protection, Inc. is a wholly owned subsidiary of

3    Carrier F&S Americas, making Carrier F&S Americas the indirect owner of Kidde-Fenwal, Inc. via a

4    holding company.

5        45.    **Defendant Carrier Fire & Security Corporation ("Carrier F&S")** is a corporation

6    organized under the laws of the State of Delaware, with its principal place of business at 13995 Pasteur

7    Blvd, Palm Beach Gardens, Florida 33418-7231.

8
         46.    On information and belief, Carrier F&S Americas is a wholly owned subsidiary of Kidde
9
     US Holdings Inc., a holding company organized under the laws of the State of Delaware.
10
         47.    On information and belief, Kidde US Holdings Inc. is a wholly owned subsidiary of Carrier
11
     F&S, making Carrier F&S the indirect owner of Carrier F&S Americas via a holding company.
12

13       48.    **Defendant Carrier Global Corporation ("Carrier Global")** is a corporation organized

14   under the laws of the State of Delaware, with its principal place of business at 13995 Pasteur Boulevard,

15   Palm Beach Gardens, Florida 33418.

16
         49.    On information and belief, Carrier Global was formed in March 2020 when United
17
     Technologies Corporation spun off its fire and security business before it merged with Raytheon Company
18
     in April 2020.
19

20       50.    On information and belief, UTC Fire & Security Americas Corporation and UTC Fire &

21   Security Corporation became subsidiaries of Carrier Global when United Technologies Corporation spun

22   off its fire and security business in March 2020.

23
         51.    In September 2020, UTC Fire & Security Americas Corporation and UTC Fire & Security
24
     Corporation changed their names to Carrier Fire & Security Americas Corporation and Carrier Fire &
25

26

27                                                    8

COMPLAINT

Security Corporation, respectively.

52. On information and belief, Carrier Global became the ultimate corporate parent and owner of Kidde-Fenwal, Inc., Kidde Fire Protection, Inc., Carrier F&S Americas, Kidde US Holdings, Inc., and Carrier F&S when United Technologies Corporation spun off its fire and security business in March 2020.

### 2. The Fluorosurfactant Defendants

53. The term **"Fluorosurfactant Defendants"** refers collectively to Defendants 3M, Arkema Inc., BASF Corporation, ChemDesign Products Incorporated, Chemguard Inc., The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., Deepwater Chemicals, Inc., DuPont de Nemours Inc., Dynax Corporation, and E.I. DuPont de Nemours and Company n/k/a EIDP, Inc.

54. **Defendant Arkema Inc.** is a corporation organized and existing under the laws of Pennsylvania, with its principal place of business at 900 First Avenue, King of Prussia, PA 19406.

55. Arkema Inc. develops specialty chemicals and polymers.

56. Arkema, Inc. is an operating subsidiary of Arkema France, S.A.

57. On information and belief, Arkema Inc. designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

58. **Defendant BASF Corporation ("BASF")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932.

59. On information and belief, BASF is the successor in interest to Ciba. Inc. (f/k/a Ciba Specialty Chemicals Corporation).

9

60.     On information and belief, Ciba Inc. designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

61.     **Defendant ChemDesign Products Inc. ("ChemDesign")** is a corporation organized under the laws of Delaware, with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143.

62.     On information and belief, ChemDesign designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

63.     **Defendant Deepwater Chemicals, Inc. ("Deepwater")** is a corporation organized under the laws of Delaware, with its principal place of business located at 196122 E County Road 40, Woodward, Oklahoma 73801.

64.     On information and belief, Deepwater Chemicals designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

65.     **Defendant Dynax Corporation ("Dynax")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523.

66.     On information and belief, Dynax entered into the AFFF market on or about 1991 and quickly became a leading global producer of fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors.

COMPLAINT

67.     On information and belief, Dynax designed, manufactured, marketed, distributed, and sold fluorosurfactants and fluorochemical stabilizers containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

68.     **Defendant E.I. DuPont de Nemours and Company n/k/a EIDP, Inc. ("Old DuPont")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

69.     On information and belief, Old Dupont is the successor in interest to DuPont Chemical Solutions Enterprise.

70.     **Defendant The Chemours Company ("Chemours Co.")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, P.O. Box 2047, Wilmington, Delaware 19899.

71.     On information and belief, Chemours Co. was incorporated as a subsidiary of Old Dupont as of April 30, 2015. From that time until July 2015, Chemours Co. was a wholly owned subsidiary of Old Dupont.

72.     In July 2015, Old Dupont spun off Chemours Co. and transferred to Chemours Co. its "performance chemicals" business line, which includes its fluoroproducts business, distributing shares of Chemours Co. stock to Old Dupont stockholders. Chemours Co. has since been an independent, publicly traded company. On information and belief, Chemours Co. has supplied fluorosurfactants containing PFOS and PFOA, and/or their chemical precursors, to manufacturers of AFFF products.

73.     **Defendant The Chemours Company FC, LLC ("Chemours FC")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located

11

at 1007 Market Street, Wilmington, Delaware 19899. Chemours FC operates as a subsidiary of Chemours Co. and manufactures fluoropolymer resins.

74.    **Defendant DuPont de Nemours Inc. f/k/a DowDuPont, Inc. ("DuPont de Nemours Inc." or "New DuPont")** is a corporation organized and existing under the laws of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674.

75.    On August 31, 2017, DuPont merged with The Dow Chemical Company ("Dow") to create DowDuPont, Inc. ("DowDuPont"). Since the merger, DowDuPont has completed a series of separation transactions to separate its businesses into three independent, publicly traded companies for materials, science, and specialty products.

76.    **Defendant Corteva, Inc. ("Corteva")** is a corporation organized and existing under the laws of Delaware, with its principal place of business at 974 Centre Rd., Wilmington, Delaware 19805.

77.    Corteva was initially formed in February 2018 as a subsidiary of DowDuPont. From that time until June 1, 2019, Corteva was a wholly owned subsidiary of DowDuPont.

78.    On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva. On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro-rata dividend. Following that distribution, Corteva became the direct parent of Old DuPont.

79.    Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

80.    On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont

12

("New DuPont"). New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of DuPont not assumed by Corteva.

81.     Defendants E. I. Du Pont de Nemours and Company ("Old DuPont"); The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. ("New DuPont") are collectively referred to as "DuPont" or the "DuPont Defendants" throughout this Complaint.[2]

82.     On information and belief, the DuPont Defendants designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

83.     On information and belief, 3M and Chemguard also designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products.

84.     On information and belief, the Fluorosurfactant Defendants designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed in Los Angeles.

### 3.     The Fluorochemical Defendants

85.     The term **"Fluorochemical Defendants"** refers collectively to 3M, AGC Chemicals Americas. Inc., Archroma U.S., Inc., ChemDesign Products Inc., Chemicals Incorporated, The Chemours

---

[2] The City opted out of the settlement between public water systems and the DuPont Defendants in *City of Camden, et al. v. E.I. DuPont de Nemours & Co. (n/k/a EIDP, Inc.), et al.*, No. 2:23-cv-3230-RMG (D.S.C.) and AFFF MDL (Dkt. No. 3393-2, July 10, 2023).

COMPLAINT

Company, The Chemours Company FC, LLC, Clariant Corporation, Corteva, Inc., Deepwater Chemicals, Inc., DuPont de Nemours Inc., E. I. Du Pont de Nemours and Company, and Nation Ford Chemical Company.

86.     **Defendant AGC Chemicals Americas, Inc. ("AGC")** is a corporation organized and existing under the laws of Delaware, having its principal place of business at 55 East Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341.

87.     On information and belief, AGC Chemicals Americas, Inc. was formed in 2004 and is a subsidiary of AGC Inc., a foreign corporation organized under the laws of Japan, with its a principal place of business in Tokyo, Japan.

88.     AGC manufactures specialty chemicals. It offers glass, electronic displays, and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

89.     On information and belief, AGC designed, manufactured, marketed, distributed, and sold fluorochemicals containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

90.     **Defendant Archroma U.S., Inc. ("Archroma")** is a corporation organized and existing under the laws of Delaware, with its a principal place of business at 5435 77 Center Drive, Charlotte, North Carolina 28217.

91.     On information and belief, Archroma was formed in 2013 when Clariant Corporation divested its textile chemicals, paper specialties, and emulsions business to SK Capital Partners.

92.     On information and belief, Archroma designed, manufactured, marketed, distributed, and sold fluorochemicals containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing

14

the fluorosurfactants used in AFFF products.

93.   **Defendant Chemicals Incorporated. ("Chemicals Inc.")** is a corporation organized and existing under the laws of Texas, with its principal place of business located at 12321 Hatcherville, Baytown, Texas 77520.

94.   On information and belief, Chemicals Inc. supplied fluorochemicals containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

95.   **Defendant Clariant Corporation ("Clariant")** is a corporation organized and existing under the laws of New York, with its principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

96.   On information and belief, Clariant is the successor in interest to the specialty chemicals business of Sandoz Chemical Corporation ("Sandoz"). On information and belief, Sandoz spun off its specialty chemicals business to form Clariant in 1995.

97.   On information and belief, Clariant supplied fluorochemicals containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

98.   **Defendant Nation Ford Chemical Co. ("Nation Ford")** is a corporation organized and existing under the laws of South Carolina, with its principal place of business located at 2300 Banks Street, Fort Mill, South Carolina 29715.

99.   On information and belief, Nation Ford supplied fluorochemicals containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

COMPLAINT

100.    On information and belief, 3M, ChemDesign, Deepwater Chemicals, and the DuPont Defendants also supplied fluorochemicals containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products.

101.    On information and belief, the Fluorochemical Defendants supplied fluorochemicals containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products that were stored, handled, used, trained with, tested equipment with, otherwise discharged, and/or disposed in Los Angeles.

102.    All Defendants, at all times material herein, acted by and through their respective agents, servants, officers and employees, actual or ostensible, who then and there were acting within the course and scope of their actual or apparent agency, authority or duties. Defendants are liable based on such activities, directly and vicariously.

## IV.    FACTUAL ALLEGATIONS

### A.    1940s–1950s: 3M, DuPont, and the Development of a Toxic Chemical Family

103.    PFAS are a class of chemicals that contain a chain of carbon bonded to multiple fluorine atoms. There are thousands of different chemicals in the PFAS "family," each one human-made, as PFAS are not naturally occurring.

104.    The carbon-fluorine bond in PFAS is one of the shortest and strongest chemical bonds known. As a result, PFAS are thermally, chemically, and biologically stable. They resist degradation due to light, water, and biological processes.

105.    PFAS are also highly mobile molecules. They readily contaminate soils and leach from soil into groundwater, where they can travel significant distances.

16

COMPLAINT

106.    In addition, PFAS bioaccumulate and biomagnify, meaning that they tend to accumulate both in individual organisms and at every step up the food chain. And PFAS are toxic, meaning that they pose serious health risks to humans and animals. PFAS are readily absorbed after consumption or inhalation and accumulate primarily in the bloodstream, kidney, and liver.

107.    The development of this family of chemical compounds began with Defendant 3M in the 1940s. At that time, 3M's Central Research Laboratory was working with a scientist at Penn State University, Joseph H. Simons, who had developed and patented a process of preparing fluorine compounds through electrochemical fluorination ("ECF"). In 1945, 3M acquired Simons' ECF patents. It would be another three years before 3M's Central Research developed fluorinated compounds that could be used for commercial applications. During that time, 3M scientists continuously researched and created new fluorochemicals; in the words of one researcher, "[a]lmost every day we made a new molecule which had never been on the face of the earth before."[3]

108.    From the early days of its fluorochemical research, 3M recognized the very characteristics that make PFAS persistent pollutants in the environment today. For example, Simons' 1948 patent for the ECF process, which was assigned to 3M, stated that the compounds produced through ECF are "non-corrosive and of little chemical activity," and "do not react with any of the metals at ordinary temperatures and react only with the more chemically active metals, such as sodium, at elevated temperatures."[4] The patent also stated that the fluorochemicals produced by ECF do not react with other compounds or reagents due to the blanket of fluorine atoms surrounding the carbon skeleton of the molecule. 3M understood that

---

[3] Neil MacKay, *A Chemical History of 3M* at p. 30 (1991), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX 1365.pdf.
[4] Method of Making Fluorocarbons, U.S. Patent No. 2,456,027 at p. 3 (filed Apr. 1, 1944) (issued Dec. 14, 1948), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2616.pdf.

17

COMPLAINT

the stability of the carbon-to-fluorine bonds prevented the fluorinated compounds from undergoing further chemical reactions or degrading under natural processes in the environment.[5]

109.   3M was also aware of the thermal stability of its fluorinated compounds prior to commercial production. Simons' ECF patent application states that the compounds produced by ECF were thermally stable at temperatures up to 750° C (1382° F). Additional research by 3M expanded its understanding of the thermal stability of fluorinated compounds.[6]

110.   In 1949, 3M built the first manufacturing facility to expand ECF from laboratory research to commercial production, and it began to present its fluorochemical research in order to find potential uses and customers for the compounds it was manufacturing.

111.   3M soon found a customer: DuPont. In 1951, DuPont began purchasing perfluorinated carboxylic acid (perfluorooctanoic acid or PFOA), for use in manufacturing a non-stick coating called Teflon.

112.   Even then, 3M's research had already documented that PFAS accumulate in the blood of mice exposed to the chemicals in laboratory tests.[7] A 1956 study by researchers at Stanford University found that PFAS bind to proteins in human blood.

113.   In 1964, a group of DuPont employees working in Teflon manufacturing became sick after their department was moved to a more enclosed workspace.[8] They experienced chills, fever, difficulty

---

[5] 1 *Fluorine Chemistry* 401-22 (J.H. Simons ed. 1950), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX 3008.pdf.

[6] 1 *Fluorine Chemistry* 423-62 (J.H. Simons ed. 1950).

[7] 3M Test Study Results with Perfluorobutyric Acid (Jan. 10, 1950), https://static.ewg.org/reports/2019/pfa-timeline/1950_Mice.pdf?_ga=2.21758526.426747500.1673645134-2012946541.1673645134.

[8] Charles E. Lewis & Gerald R. Kerby, *An Epidemic of Polymer-Fume Fever*, 191 JAMA 375-78 (Feb. 1, 1965), https://static.ewg.org/reports/2019/pfa-timeline/1962_Teflon-Cigarette-Study.pdf.

18

COMPLAINT

breathing, and a tightness in the chest—symptoms referred to variously as "polymer-fume fever," "Teflon flu," or simply, "the shakes." Polymer-fume fever was first reported in the medical literature in 1951.

114.    A 1965 study sponsored by DuPont found liver damage and increased spleen size in rats fed a PFAS compound over a 90-day period.[9]

115.    In addition to these demonstrations of toxicity, by at least the end of the 1960s, additional research and testing performed by 3M and DuPont indicated that fluorosurfactants were resistant to environmental degradation and would persist essentially unaltered if allowed to enter the environment.

116.    One 3M employee wrote in 1964, "[t]his chemical stability also extends itself to all types of biological processes; *there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon.*"[10] Thus, 3M knew by the mid-1960s that its fluorosurfactants were immune to chemical and biological degradation in soils and groundwater.

117.    3M also knew by 1964 that fluorocarbon carboxylic acids and fluorocarbon sulfonic acids, when dissolved, dissociated to form highly stable perfluorocarboxylate and perfluorosulfonate ions. Later studies by 3M on the adsorption and mobility of FC-95 (the potassium salt of PFOS) and FC-143 (the ammonium salt of PFOA) in soils indicated very high solubility and very high mobility in soils for both compounds.[11]

---

[9] Gordon L. Nordby & J. Murray Luck, *Perfluorooctanoic Acid Interactions with Human Serum Albumin*, 219 J. Biological Chemistry 399-404 (1956), https://static.ewg.org/reports/2019/pfatimeline/1956_Stanford.pdf?_ga=2.126530317.12538618 71.1649070681-2123137255.1639662520.

[10] 5 *Fluorine Chemistry* 310 (J.H. Simons ed. 1964), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3022.pdf.

[11] 3M Technical Report Summary from Stephen K. Welsh to D.L. Bacon on Adsorption of FC 95 and FC143 on Soil (Feb. 27, 1978), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1158.pdf.

19
COMPLAINT

**B.     1960s: The Introduction of AFFF**

118.    Despite early warnings of the toxic, persistent, and bioaccumulative nature of PFOS and PFOA, these chemicals began to be used in a product that would be released in large quantities directly into the environment whenever used: firefighting foam.

119.    Before the creation of AFFF, firefighting foam was made without the fluorosurfactants that contain PFOA, PFOS, and/or their precursor chemicals.

120.    AFFF was first developed in the 1960s as a result of the Navy's research, in cooperation with 3M, into the use of fluorosurfactants in firefighting foam to extinguish fuel-based shipboard fires. AFFF is synthetically formed by combining fluorine-free hydrocarbon foaming agents with fluorosurfactants. When mixed with water, the resulting solution produces an aqueous film that spreads across the surface of hydrocarbon fuel, extinguishing the fire.

121.    In 1969, the Navy promulgated a military standard or "MilSpec" requiring contractors to use "fluorocarbon surfactants" in firefighting foam products. Since then, the Navy has revised this MilSpec multiple times, but at no time did the Navy specify the specific fluorosurfactants to be used in AFFF. The AFFF MilSpec was a "performance specification," meaning that the product manufacturers were given great flexibility with respect to designing a product that would meet the military's performance requirements.

122.    Beginning in the 1960s, the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products that used fluorosurfactants containing either PFOS, PFOA, or the chemical precursors that degrade into PFOS and PFOA.

123.    From the late 1960s to 2002, Defendant 3M manufactured and sold AFFF containing PFOS under the brand name "Light Water."

COMPLAINT

124.   Because 3M held the patents on the ECF process, other AFFF Defendants utilized PFAS produced through a different process, called fluorotelomerization. These fluorotelomer AFFF formulations were produced beginning in the 1970s. Although they are not made with PFOA, they contain precursors—polyfluorinated compounds that are now known to degrade to compounds that include PFOA.

125.   On information and belief, the AFFF Defendants designed, manufactured, marketed, distributed, and/or sold the AFFF products discharged into the environment in Los Angeles during firefighting training and emergency response activities.

126.   The AFFF Defendants treated their foam formulations as proprietary information and did not disclose the specific chemical ingredients of their formulations to government agencies or the public.

127.   Some or all of the Defendants understood how stable the fluorinated surfactants used in AFFF are when released into the environment from their first sale to a customer, yet they failed to warn their customers or provide reasonable instruction on how to manage wastes generated from their products.

**C.   1970s–1980s: Defendants' Deepening Knowledge of the Risks of PFOA and PFOS**

128.   By at least the 1970s, as Defendants expanded the market for AFFF formulations containing PFOA and PFOS, 3M, and DuPont knew or should have known that PFOA and PFOS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

129.   An internal 3M memo from 1971 states that the "thesis that there is 'no natural sink' for fluorocarbons obviously demands some attention[,]" concluding that certain fluorocarbons could remain in the earth "unchanged for many thousands of years."[12] But if 3M did give this issue the attention demanded at this time, it did not share it with the public.

---

[12] 3M Memorandum from H.G. Bryce to R.M. Adams on Ecological Aspects of Fluorocarbons at pp. 1, 4 (Sept. 13, 1971), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1088.pdf.

COMPLAINT

130.   In 1975, two independent toxicologists, Dr. William Guy and Donald Taves, discovered that an unidentified fluorine compound had been found in human blood sampled from different blood banks. Dr. Guy contacted 3M to ask if it knew of "possible sources" of the chemicals.[13] 3M's scientists concluded internally that the fluorine compounds resembled PFOS manufactured by 3M, but 3M did not share this conclusion with the independent toxicologists or anyone else outside of 3M.

131.   3M did, however, test the blood of its own workers in 1976, finding "up to 1000 times 'normal' amounts of organically bound fluorine in their blood."[14]

132.   That same year, another 3M study found that FC-95 (i.e., PFOS) did not biodegrade—an unsurprising result, given that, as the report noted, "[b]iodegradation of FC 95 is improbable because it is completely fluorinated."[15]

133.   In 1977, Ansul, the AFFF manufacturer later acquired by Defendant Tyco, authored a report titled *Environmentally Improved AFFF*, which acknowledged that releasing AFFF into the environment could pose potential negative impacts to groundwater quality.[16] Ansul wrote: "The purpose of this work is to explore the development of experimental AFFF formulations that would exhibit reduced impact on the environment while retaining certain fire suppression characteristic . . . improvements [to AFFF formulations] are desired in the environmental area, i.e., development of compositions that have a reduced impact on the environment without loss of fire suppression effectiveness."[17] Thus, Ansul knew

---

[13] 3M Memorandum from G.H. Crawford to L.C. Krogh *et al.* on Fluorocarbons in Human Blood Plasma at p. 1 (Aug. 20, 1975), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1118.pdf.
[14] 3M Memorandum on Chronology – Fluorochemicals in Blood at p. 2 (Aug. 26, 1977), https://www.ag.state.mn.us/ Office/Cases/3M/docs/PTX/PTX1144.pdf.
[15] Technical Report Summary from E.A. Reiner to R.L. Bohon on Biodegradation Studies of Fluorocarbons – III (Aug. 12, 1976).
[16] Ansul Final Report on Environmentally Improved AFFF, N00173-76-C-0295 (Dec. 13, 1977), https://apps.dtic.mil/ sti/tr/pdf/ADA050508.pdf.
[17] *Id.* at pp. 1, 3–4.

22

COMPLAINT

by the mid-1970s that the environmental impact of AFFF needed to be reduced, yet there is no evidence that Ansul (or any other Defendant) ever pursued initiatives to do so.

134.    A 1978 3M biodegradation study likewise reported that an "extensive study strongly suggest[ed]" one of its PFAS was "likely to persist in the environment for extended periods unaltered by metabolic attack."[18] A year later, a 3M study reported that one of its fluorosurfactants "was found to be completely resistant to biological test conditions," and that it appeared waterways were the fluorosurfactant's "environmental sink."[19]

135.    At the same time, several studies sponsored by 3M showed that the fluorosurfactants used in AFFF were even more toxic than previously believed. A study of subacute toxicity in rhesus monkeys, in which the monkeys were to be given doses of PFOS over ninety days, had to be redesigned and repeated "[b]ecause of unexpected early mortalities in all monkeys at all levels[.]"[20] None of the monkeys survived past twenty days. As a summary of the study stated, PFOS "proved to be considerably more toxic to monkeys than anticipated."[21] In addition, PFOA reduced the survival rate of fathead minnow fish eggs,[22] and PFOS and PFOA were shown to be toxic to rats.[23] As the summary observed, "[b]ecause of the apparent

---

[18] 3M Technical Report Summary from E.A. Reiner to D.L. Bacon on Biodegradation Studies of Fluorocarbons – II at p. 2 (Jan. 9, 1978), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1153.pdf.
[19] 3M Technical Report Summary from A.N. Welter to R.A. Prokop on Final Comprehensive Report: FC 143 at pp. 3, 6 (Mar. 23, 1979), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2569.pdf.
[20] IRDC Review of Final Reports and Summary on FC-95, FC-143 and FM-3422 – 90 Day Subacute Toxicity Studies at p. 2 (Mar. 20, 1979), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1199.pdf; see also 3M Study on Ninety-Day Subacute Rhesus Monkey Toxicity Study (Dec. 18, 1978), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1191.pdf; 3M Study on 90-Day Subacute Rhesus Monkey Toxicity Study (Jan. 2, 1979), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1193.pdf.
[21] IRDC Review of Final Reports and Summary on FC-95, FC-143 and FM-3422 – 90 Day Subacute Toxicity Studies at p. 2 (Mar. 20, 1979), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1199.pdf.
[22] 3M Study on The Effects of Continuous Aqueous Exposure to 78.03 on Hatchability of Eggs and Growth and Survival of Fry of Fathead Minnow (June 1978), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1176.pdf.
[23] 3M Study on Acute Oral Toxicity (LD$_{50}$) Study in Rats (May 5, 1978), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1170.pdf; IRDC Review of Final Reports and Summary on FC-

---

23

COMPLAINT

persistence of these fluorochemicals in the body, *the most important question remains possible long term effects.*"[24]

136.    In 1979, 3M also completed a comprehensive biodegradation and toxicity study covering investigations between 1975 and 1978.[25] More than a decade after 3M began selling AFFF containing fluorosurfactants, it wrote, "[t]here has been a general lack of knowledge relative to the environmental impact of these chemicals[.]"[26] The report asked, "[i]f these materials are not biodegradable, what is their fate in the environment?"[27]

137.    In 1979, 3M and DuPont discussed 3M's discovery of high levels of PFOS in the blood of its workers. Both companies came to the same conclusion: there was "no reason" to notify the United States Environmental Protection Agency ("EPA") of the finding.[28] 3M told the EPA in 1980 only that it had discovered PFOS in the blood of "some of our plant employees."[29]

138.    As early as the end of the 1980s, additional research and testing performed by Defendants, including at least 3M and DuPont, indicated that elevated incidence of certain cancers and other adverse health effects were occurring. Those cancers and adverse health effects included elevated liver enzymes and birth defects observed among workers exposed to such materials, including at least PFOA. But such

95, FC-143 and FM-3422 – 90 Day Subacute Toxicity Studies (Mar. 20, 1979), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1199.pdf.
[24] IRDC Review of Final Reports and Summary on FC-95, FC-143 and FM-3422 – 90 Day Subacute Toxicity Studies at p. 1 (Mar. 20, 1979), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1199.pdf.
[25] 3M Technical Report Summary from A.N. Welter to R.A. Prokop on Final Comprehensive Report on FM 3422 (Feb. 7, 1979), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2563.pdf.
[26] *Id.* at p. 2.
[27] *Id.*
[28] 3M Memorandum from R.A. Prokop to J.D. Lazerte on Disclosure of Information on Levels of Fluorochemicals in Blood at p. 1 (July 26, 1979), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2723.pdf.
[29] AFFF MDL, Dkt. No. 1968-17 at p. 1, Nov. 5, 2021.

24

COMPLAINT

1 data was not published, provided to governmental entities as required by law, or otherwise publicly

2 disclosed at the time.

3    139.   In 1981, DuPont tested for, and found, PFOA in the blood of female workers at its

4 Washington Works plant in Parkersburg, West Virginia, where it had been using 3M's PFOA to

5 manufacture Teflon since 1951. DuPont observed and documented pregnancy outcomes in exposed

6 workers. They found that two of seven children born to female plant workers between 1979 and 1981 had

7 birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[30]

8

9    140.   In 1983, 3M researchers concluded that concerns about PFAS "give rise to concern for

10 environmental safety," including "legitimate questions about the persistence, accumulation potential, and

11 ecotoxicity of fluorochemicals in the environment."[31] That same year, 3M completed a study finding that

12 PFOS caused the growth of cancerous tumors in rats.[32] This finding was later shared with DuPont and led

13 them to consider whether "they may be obliged under their policy to call FC-143 a carcinogen in

14 animals."[33]

15

16    141.   In 1984, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers.

17 This led one of the company's medical officers to warn in an internal memo: "[W]e must view this present

18 trend with serious concern. It is certainly possible that . . . exposure opportunities are providing a potential

19

20

21

22 [30] C-8 Blood Sampling Results, https://static.ewg.org/files/PFOA_013.pdf?_ga=2.163206265.435547009.1676618801-2012946541.1673645134 (last visited Apr. 14, 2024).
23 [31] 3M Memorandum from R.L. Rohn to J.D. Lazerte on Fate of Fluorochemicals Phase II at p. 8 (May 25, 1983), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1284.pdf.
24 [32] Riker Labs., Inc./3M Study on Two Year Oral (Diet) Toxicity/Carcinogenicity Study of Fluorochemical FC-143 in Rats, Volume 1 of 4 (Conducted During Apr., 1981 - May, 1983), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1337.pdf.
25 [33] 3M Memorandum from R.G. Perkins to F.D. Griffith on Summary of the Review of the FC-143 Two-Year Feeder Study at p. 1 (Jan. 5, 1988), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1343.pdf.
26

27                                             25
COMPLAINT

1  uptake of fluorochemicals that exceeds excretion capabilities of the body."[34]

2  142.    The same year, DuPont tested drinking water near its Washington Works plant and found

3  elevated PFOA levels in the water. But, after deciding that limiting PFOA discharge from the plant would

4  not be "economically attractive," it did nothing to reduce contamination from the plant.

5  **D.    1990s–2000s: With 3M and DuPont Under Scrutiny, the AFFF Market Shifts to**
6  **Telemerization.**

7  143.    Federal law requires chemical manufacturers and distributors to immediately notify the

8  EPA if they have information that "reasonably supports the conclusion that such substance or mixture

9  presents a substantial risk of injury to health or the environment." Toxic Substances Control Act ("TSCA")

10 § 8(e), 15 U.S.C. § 2607(e).

11

12 144.    Despite its decades of research, 3M waited until May 1998 to submit a report to the EPA

13 under TSCA section 8(e). Even in that submission, however, 3M downplayed what it knew. According to

14 a former employee:

15 > Just before that submission we found PFOS in the blood of eaglets—eaglets still young
16 > enough that their only food consisted of fish caught in remote lakes by their parents. This
> finding indicates a widespread environmental contamination and food chain transfer and
17 > probable bioaccumulation and bio-magnification. This is a very significant finding that the
> 8e reporting rule was created to collect. 3M chose to report simply that PFOS had been
18 > found in the blood of animals, which is true but omits the most significant information.[35]

19 145.    And although 3M acknowledged, in 1998, the presence of PFOS in the blood of the general

20 population, it insisted that it did not "believe that any reasonable basis exists to conclude that PFOS

---

[34] 3M Memorandum from D.E. Roach to P.F. Riehle on Organic Fluorine Levels at p. 1 (Aug. 31, 1984), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1313.pdf.
[35] Letter from R. Purdy to 3M at pp. 1–2 (Mar. 28, 1999), https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1001.pdf.

26
COMPLAINT

'presents a substantial risk of injury to health or the environment.'"[36] Internally, the message was quite different: 3M's Manager of Corporate Toxicology advised the company to replace "PFOS-based chemistry as these compounds [are] *VERY persistent and thus insidiously toxic*."[37]

146.    In 2000, 3M, after half a century of manufacturing fluorinated chemicals through ECF, announced that it would phase out its production of several long-chain PFAS compounds, including PFOA, although it continued to manufacture other PFAS chemicals.

147.    In April 2006, 3M agreed to pay the EPA a penalty of more than $1.5 million after being cited for 244 violations of the TSCA, which included violations for failing to disclose studies regarding PFOS, PFOA, and other fluorinated compounds, dating back decades.

148.    The late 1990s and early 2000s also brought scrutiny to DuPont's use of PFOA, beginning in 1998 when a farmer in the Ohio River Valley sued DuPont over contamination from its Washington Works plant. DuPont had purchased land from the farmer in 1984 for use as a landfill for supposedly non-hazardous waste materials. Over the years, that farmer observed wildlife dying off near the landfill, serious illness among family members, and the loss of an entire herd of cattle. DuPont settled that case in 2001, but soon faced another lawsuit, as that same landfill plot contained a creek that fed directly into the Ohio River, exposing tens of thousands of residents to PFOA contamination. The settlement agreement in the second action included the creation of a panel of independent scientists tasked with researching the health

---

[36] Letter 3M to Office of Toxic Substances on TSCA Section 8(e) – Perflourooctane Sulfonate – Docket Numbers 8EHQ-1180-373; 8EHQ-1180-374; 8EHQ-0381-0394 at p. 1 (May 15, 1958), https://static.ewg.org/reports/2020/pfas-epa-timeline/1998_3M-Alerts-EPA.pdf.
[37] Deena Winter, *Toxic: 3M knew its chemicals were harmful decades ago, but didn't tell the public, government*, Minn. Reformer (Dec. 15, 2022, 6:01 AM), https://minnesotareformer.com/2022/12/15/toxic-3m-knew-its-chemicals-were-harmful-decades-ago-but-didnt-tell-the-public-government/ [https://perma.cc/4XWY-CWQ6] (alteration in original) (emphasis added).

27

COMPLAINT

effects of PFOA, called the "C8 Science Panel." C8 is another term for PFOA, based on its eight carbon atoms.

149.    The C8 Science Panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. Between 2005 and 2013, the C8 Science Panel carried out exposure and health studies in the Mid-Ohio Valley communities. The panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy-induced hypertension (including preeclampsia), and hypercholesterolemia.

150.    In December 2005, the EPA announced it was imposing the "largest environmental administrative penalty in agency history" against DuPont based on evidence that it violated the TSCA by concealing the environmental and health effects of PFOA.[38]

151.    Following 3M's phase-out of ECF production and its AFFF product, telomerization emerged as the dominant manufacturing process for fluorosurfactants. 3M had been the dominant manufacturer in the lucrative AFFF market, and multiple companies seized the opportunity created by 3M's withdrawal. But the market opportunity presented uncertainties, as it was unclear whether regulators would view the telomer-based AFFF as posing the same hazards as 3M's PFOS-containing AFFF. The key question for regulators was whether the telomer-based AFFF would degrade to PFOA once in the environment.

152.    In 2001, Tyco (then Ansul), Arkema, Buckeye, Chemguard, DuPont, Dynax, and Kidde-Fenwal, Inc., formed a group called the Fire Fighting Foam Coalition ("FFFC") to protect their business

---

[38] *EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History*, EPA (Dec. 14, 2005), https://www.epa.gov/archive/epapages/newsroom_archive/newsreleases/fdcb2f665 cac66bb852570d7005d6665.html.

28

COMPLAINT

opportunity and advocate for the continued use of telomer-based AFFF. The FFFC declared that it would serve as "a single source for accurate, balanced information on environment related questions" and would "ensure that accurate information about PFOS alternatives, including telomer-based products, is disseminated in the marketplace."[39] The FFFC made several representations regarding the safety of telomer-based AFFF that were either misleading half-truths or were contrary to Defendants' internal knowledge. For example, the FFFC assured the public that "[t]here is no known biological pathway by which telomer-based AFFF can be oxidized or metabolized into PFOS."[40] This statement was true, but only because PFOS was exclusively manufactured by 3M, and it did not mean that telomer-based AFFF was any safer. Importantly, this statement omitted the fact that telomer-based AFFF degrades into PFOA.

153.    Instead, the FFFC told the EPA in 2001 that telomer-based AFFF "does not contain any PFOA-based product." Meanwhile, one company executive admitted in an internal memo that his company's AFFF "will degrade in the environment" to produce PFOA, and the "question is how toxic" and how "bioaccumulative" these degraded products are.[41] But contrary to this internal acknowledgment, the FFFC publicly asserted that "telomer-based fire fighting foams are not likely to be a source of PFOA in the environment."[42]

154.    The EPA appointed a committee known as the Telomer Technical Workgroup to make recommendations to the EPA. The president of the FFFC represented the telomer-based AFFF industry on the EPA committee. In 2003, when the Telomer Technical Workgroup reported its conclusions and

---

[39] *Fact Sheet on AFFF Fire Fighting Agents* at p. 2, FFFC, https://static.ewg.org/reports/2020/pfas-firefighter-timeline/2002-03-FFFC.pdf (last visited Apr. 14, 2024).
[40] *Id.* at p. 1.
[41] AFFF MDL, ECF 2409-112 at pp. 1–2, June 17, 2022.
[42] Email t. Cortina to Members on ECA Plenary Meeting at p. 1 (Oct. 30, 2003), https://static.ewg.org/reports/2020/pfas-firefighter-timeline/2003-Telomers_Safe_Email.pdf?_ga=2.128105996.1253861871.1649070681-2123137255.1639662520.

29

COMPLAINT

recommendations, the FFFC president was the spokesperson.

155.    In what the FFFC president called a "major victory" for the industry, the EPA accepted the proposal of its Workgroup that "telomer-based fire fighting foams no longer be considered as part of the PFOA ECA process."[43] The FFFC president remarked that "[w]hen we started this organization two years ago [in 2001], the fate of telomer-based AFFF was being tied directly to the fate of PFOA and the EPA had just told the military to start searching for alternatives to AFFF."[44] The telomer-based AFFF Defendants had successfully forestalled government restrictions on their products, thereby prolonging the use of AFFF in Los Angeles and elsewhere.

156.    The fluorosurfactants used in AFFF products sold by the AFFF Defendants other than 3M were manufactured by the Fluorosurfactant Defendants through the process of telomerization.

157.    The fluorochemicals the Fluorosurfactant Defendants needed to manufacture those fluorosurfactants contained PFOS, PFOA, and/or their chemical precursors and were designed, manufactured, marketed, distributed, and/or sold by the Fluorochemical Defendants.

158.    On information and belief, the Fluorochemical and Fluorosurfactant Defendants were aware that the fluorochemicals and fluorosurfactants they designed, manufactured, marketed, distributed, and/or sold would be used in the AFFF products designed, manufactured, marketed, distributed, and/or sold by the AFFF Defendants.

159.    On information and belief, the Fluorochemical and Fluorosurfactant Defendants designed, manufactured, marketed, distributed, and/or sold the fluorochemicals and/or fluorosurfactants contained

---

[43] *Id.*
[44] *Id.*

30

1   in the AFFF products discharged into the environment within Los Angeles during firefighting training and

2   emergency response activities.

3       E.    **The DuPont Defendants' Fraudulent Transfers**

4       160.    The DuPont Defendants have engaged in a series of transactions to shield assets from, and

5   otherwise hinder or delay, their creditors, which include the City.

6

7       161.    In 2013, Old DuPont announced its intention to separate its performance chemicals

8   business, including fluoroproducts, through a U.S. tax-free spin-off to shareholders. In this spinoff, a

9   newly formed subsidiary would assume significant environmental and tort liabilities of Old DuPont, pay

10  a multibillion-dollar dividend to Old DuPont, and be spun-off to Old DuPont's shareholders.

11      162.    Chemours Co. was formed in February 2014 as a wholly owned subsidiary of Old DuPont,

12  remaining so until July 1, 2015, when Old DuPont completed the spin-off, along with the assumption by

13  Chemours Co. of vast environmental liabilities which included those related to PFOS and PFOA and

14  fluorosurfactants ("the Chemours Spinoff").

15

16      163.    Through their effectuation of the spin-off in July 2015, Chemours Co. and Old DuPont

17  caused Chemours Co. to transfer valuable assets to Old DuPont, including but not limited to, a $3.9 billion

18  dividend (the "Transfers"), while simultaneously assuming significant liabilities (the "Assumed

19  Liabilities").

20      164.    At the time the Transfers were made, and Assumed Liabilities were assumed, Chemours

21  had a separate board. However, the board was controlled by Old DuPont employees.

22

23      165.    At the time the Transfers were made and Assumed Liabilities were assumed, Old DuPont

24  had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed

25

26

27                                          31

regarding Old DuPont's liabilities for damages and injuries from the manufacture, sale, and/or disposal of PFAS-containing products. For example:

      A.    In 2005, Old DuPont agreed to pay $16.5 million in civil penalties to the EPA to resolve eight counts of alleged violations of environmental statutes concerning PFAS contamination.

      B.    Also in 2005, Old DuPont agreed to pay $343 million to settle the class action lawsuit filed on behalf of 70,000 residents of the Ohio River Valley relating to the contamination of the watershed with PFOA. This settlement also created the C8 Science Panel, which conducted studies on the health effects of PFOA exposure between 2005 and 2013.

      C.    In 2015, another MDL involving over 3,500 PFOA-related personal injury claims brought by citizens of Ohio and West Virginia was pending in Ohio.[45]

166.    The assets Old DuPont transferred to Chemours were unreasonably small in relation to the business or transaction and to the Assumed Liabilities. As a result, Chemours Co. did not receive a reasonably equivalent value in exchange for its assumption of liabilities of Old DuPont.

167.    Old DuPont knew or reasonably should have known that Chemours Co. would incur debts beyond its ability to pay as they became due. Through the Transfers and Assumed Liabilities Old DuPont and Chemours Co. limited the availability of assets to cover all of the liability for damages and injuries arising from Old DuPont's manufacture and sale of PFAS-containing products.

168.    On information and belief, Old Dupont and Chemours Co. entered into the Transfers and provided for Chemours Co.'s assumption of the Assumed Liabilities with actual intent to hinder or delay

---

[45] On February 13, 2017, following three multimillion-dollar jury verdicts in three bellwether trials in the Ohio MDL, Old DuPont and Chemours Co. agreed to pay $671 million to resolve the Ohio MDL, with an additional $125 million promised by Chemours Co. for future PFOA costs not covered by the settlement for a period of five years.

COMPLAINT

their creditors, which includes the City.

169.   The assumption of liabilities by Chemours Co. did not relieve Old DuPont of liability for the claims asserted herein or other liabilities related to Old DuPont's manufacture and sale of PFAS-containing products.

170.   In furtherance of Old DuPont's efforts to shield assets from and otherwise hinder or delay creditors, in December 2015 Old DuPont and Dow completed a merger in which each of them merged into a separate subsidiary of a newly formed entity, DowDuPont. On information and belief, Old DuPont and Dow merged into separate subsidiaries of DowDuPont as part of an effort to avoid exposing Dow to the existing liabilities of Old DuPont, including liability for the claims asserted herein and other PFAS liabilities.

171.   Following the Dow-DuPont merger, DowDuPont engaged in a series of significant internal reorganizations and other transactions (the "Post-Merger Transactions"). Those included the transactions provided for in an April 1, 2019, Separation and Distribution Agreement (the "DowDuPont Separation Agreement") among DowDuPont and its two subsidiaries, Dow, Inc. and Corteva, Inc. On information and belief, as part of the Post-Merger Transactions, significant assets of Old DuPont were transferred to DowDuPont and Corteva for less than reasonably equivalent value, leaving Old DuPont with assets that were unreasonably small in relation to its business. After these transactions, Old DuPont had assets insufficient to pay its liabilities, including its liabilities for the claims asserted herein, and other PFAS liabilities.

172.   The Post-Merger Transactions were completed on or about June 1, 2019, when: (a) the "Agriculture Business" of Old DuPont was held by Corteva, (b) 100% of the stock of Old DuPont was held by Corteva, (c) the stock of Corteva was spun-off to the shareholders of DowDuPont, (d) the stock

33

COMPLAINT

of the Dow, Inc. subsidiary of DowDuPont was distributed to the shareholders of DowDuPont, and (e) the "Specialty Products Business" and certain other assets of Old DuPont were retained by DowDuPont (whose name was changed to DuPont de Nemours Inc. ("New Dupont")).

173.    On information and belief, the DuPont Defendants engaged in the Post-Merger Transactions with actual intent to hinder or delay the City and other creditors.

174.    Further, in effecting the Post-Merger Transactions, the DuPont Defendants knew or should have known that Old DuPont would no longer have sufficient assets to pay its liabilities, including its liabilities for the claims asserted herein and other PFAS liabilities.

175.    Further, as part of the DowDuPont Separation Agreement, Corteva and New DuPont (f/k/a DowDuPont) assumed direct financial responsibility for certain liabilities of Old DuPont including, on information and belief, liability for the claims asserted herein and other PFAS liabilities. Corteva assumed responsibility for 29% of such liabilities and New DuPont assumed responsibility for 71% thereof.

**F.    Defendants Hid What They Knew from the Government and the Public**

176.    On information and belief, Defendants knew or should have known that their AFFF/PFAS-Containing Products would likely injure and/or threaten public health and the environment, even when used as intended or directed.

177.    Defendants failed to warn of these risks to the environment and public health, including the impact of their AFFF/PFAS-Containing Products on the quality of unprotected water sources.

178.    Defendants were all sophisticated and knowledgeable in the art and science of designing, formulating, and manufacturing AFFF/PFAS-Containing Products. They understood far more about the properties of their AFFF/PFAS-Containing Products—including the potential hazards they posed to

34

human health and the environment—than any of their customers. Still, Defendants declined to use their sophistication and knowledge to design safer products.

179.    3M and DuPont did not, nor, on information and belief, did any other Defendant comply with their obligations to notify the EPA about the "substantial risk of injury to health or the environment" posed by their AFFF/PFAS-Containing Products. TSCA § 8(e), 15 U.S.C. § 8(e).

180.    Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birth weight, high uric acid, and high cholesterol. In laboratory testing on animals, PFOA and PFOS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

181.    The injuries caused by PFAS can arise months or years after exposure.

182.    Even after the C8 Science Panel publicly announced that human exposure to fifty parts per trillion, or more, of PFOA in drinking water for one year or longer had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically diagnosed high cholesterol, Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFOA in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

183.    Furthermore, Defendants have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate to satisfy the standards of Defendants to prove such adverse effects upon and/or any risk to humans with respect to PFOA in human blood.

COMPLAINT

184.   At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing the public from discovering the existence and extent of any injuries/harm as alleged herein.

**G.     Federal, State, and International Government Agencies Call for Monitoring and Remediation of PFAS Contamination**

185.   On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015, including six PFAS chemicals: PFOS, PFOA, perfluorobutanesulfonic acid (PFBS), perfluorohexanesulfonic acid (PFHxS), perfluoroheptanoic acid (PFHpA), and perfluorononanoic acid (PFNA).[46]

186.   In the May 2015 *The Madrid Statement on Poly- and Perfluoroalkyl Substances (PFASs)*, scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[47]

---

[46] Revisions to the Unregulated Contaminant Monitoring Regulation (UCMR 3) for Public Water Systems, 77 Fed. Reg. 26,072 (May 2, 2012).
[47] A. Blum *et al.*, *The Madrid Statement on Poly- and Perfluoroalkyl Substances (PFASs)*, 123 Env't Health Perspectives 107-11, http://dx.doi.org/10.1289/ehp.1509934.

36

COMPLAINT

187.    On May 25, 2016, the EPA released a lifetime health advisory level ("HAL") for drinking water and health effects support documents for PFOS and PFOA.[48] The EPA developed the HAL to assist governmental officials protect public health when PFOS and PFOA are present in drinking water. The EPA HAL identified the concentration of PFOS and PFOA in drinking water at or below the level at which adverse health effects are not anticipated to occur over a lifetime of exposure. That level was 0.07 ppb or 70 ppt. The HAL was based on peer-reviewed studies of the effects of PFOS and PFOA on laboratory animals (rats and mice) and was also informed by epidemiological studies of human populations exposed to PFOS. These studies indicated that exposure to PFOS and PFOA over the HAL could result in adverse health effects, including:

A.      Developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations);

B.      Cancer (testicular and kidney);

C.      Liver effects (tissue damage);

D.      Immune effects (e.g., antibody production and immunity); and

E.      Thyroid disease and other effects (e.g., cholesterol changes).

188.    In 2016, the National Toxicology Program ("NTP") of the United States Department of Health and Human Services ("USDHHS") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of fluorochemicals. The NTP concluded that both PFOA and PFOS are "presumed to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects in human

---

[48] *See* Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate, 81 Fed. Reg. 33,250 (May 25, 2016).

37

COMPLAINT

(epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.[49]

189.    IARC similarly concluded that there is "evidence" of "the carcinogenicity of [PFOA]" in humans and in experimental animals, meaning that "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is . . . credible[.]"[50]

190.    The United States Senate and House of Representatives passed the National Defense Authorization Act in November 2017, which included $42 million to remediate fluorochemical contamination from military bases, as well as devoting $7 million toward the Investing in Testing Act, which authorizes the Center for Disease Control and Prevention to conduct a study into the long-term health effects of PFOA and PFOS exposure.[51] The legislation also required that the Department of Defense submit a report on the status of developing a new military specification for AFFF that did not contain PFOS or PFOA.[52]

191.    In June 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and the EPA released a draft toxicological profile for PFOS and PFOA. They recommended the drinking water advisory levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.[53]

192.    In December 2019, the United States Senate and House of Representatives passed the National Defense Authorization Act for Fiscal Year 2020 ("FY 2020 NDAA"), which introduced new

---

[49] *See NTP Monograph on Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate* at pp. 1, 17, 19, NTP (Sept. 2016), https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf.
[50] *Some Chemicals Used as Solvents and in Polymer Manufacture* at pp. 27, 97, IARC Monographs (Dec. 2016), http://monographs.iarc.fr/ENG/Monographs/vol110/mono110.pdf.
[51] National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91, 131 Stat. 1283 (2017), https://www.congress.gov/115/plaws/publ91/PLAW-115publ91.pdf.
[52] *Id.*; *see also Alternatives to Aqueous Film Forming Foam Report to Congress*, U.S. Dep't of Defense (June 2018), https://www.denix.osd.mil/derp/home/documents/alternatives-to-aqueous-film-forming-foam-report-to-congress/.
[53] *Toxicological Profile for Perfluoroalkyls*, USDHHS (May 2021), https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf.

38

COMPLAINT

prohibitions on the use of AFFF for military land-based applications.[54] Section 322(a) of the Act introduced a timeline for the phasing out of AFFF use by the military, including by requiring the Secretary of the Navy to publish a military specification for a fluorine-free fire-fighting agent for use at all military installations by October 1, 2023.[55] Section 322(b) and (c) then provide that Department of Defense organizations will no longer be authorized to purchase AFFF containing more than 1 part per billion of PFAS after October 1, 2023, and that after October 1, 2024, this prohibition will extend to the use of any PFAS-containing AFFF at any military installation.[56]

193.    On February 20, 2020, the EPA announced a proposed decision to regulate PFOA and PFOS under the Safe Drinking Water Act ("SDWA"), which the EPA characterized as a "key milestone" in its efforts to "help communities address per- and polyfluoroalkyl substances (PFAS) nationwide."[57]

194.    On December 27, 2021, the EPA published its Fifth Unregulated Contaminant Monitoring Rule ("UCMR 5"), requiring public water systems nationwide to monitor for 30 contaminants of concern between 2023 and 2025. Those contaminants were lithium and 29 different PFAS substances including PFOS and PFOA.[58]

195.    On June 15, 2022, the EPA released new drinking water HALs for four PFAS, including new interim HALs for PFOS and PFOA that departed significantly from the 2016 EPA HAL they

---

[54] National Defense Authorization Act for Fiscal Year 2020, Pub. L. No. 116-92, 133 Stat. 1198 (2019), https://www.govinfo.gov/content/pkg/BILLS-116s1790enr/pdf/BILLS-116s1790enr.pdf.
[55] Id. § 332(a), 133 Stat. 1198, 1307.
[56] Id. § 332(b), (c), 133 Stat. 1198, 1308.
[57] EPA Announces Proposed Decision to Regulate PFOA and PFOS in Drinking Water, EPA (Feb. 20, 2020), https://www.epa.gov/newsreleases/epa-announces-proposed-decision-regulate-pfoa-and-pfos-drinking-water.
[58] Revisions to the Unregulated Contaminant Monitoring Rule (UCMR 5) for Public Water Systems and Announcement of Public Meetings, 86 Fed. Reg. 73,131 (Dec. 27, 2021).

COMPLAINT

replaced.[59] Specifically, the EPA issued HALs of 0.004 ppt for PFOA and 0.02 ppt for PFOS,[60] which collectively accounted for only a small fraction of the combined 70 ppt HAL that preceded them. Importantly, the EPA set these interim HALs at levels below which PFOS and PFOA can be measured using current analytic methods, meaning that the mere detection of PFOS or PFOA in a water provider's system would be sufficient on its own to exceed the new levels.

196.    As support for its decision, the EPA explained that the new interim HALs for PFOS and PFOA were "based on human studies" that "found associations between PFOA and/or PFOS exposure and effects on the immune system, the cardiovascular system, human development (e.g., decreased birth weight), and cancer."[61] Specifically, the EPA had performed updated health effects analyses for PFOS and PFOA to provide support for the drinking water regulations the EPA planned to adopt for the two chemicals under the SDWA. Based on these analyses, the EPA concluded that "the levels at which negative health effects could occur are much lower than previously understood when the EPA issued the 2016 health advisories for PFOA and PFOS—including near zero for certain health effects."[62] For this reason, the EPA determined there was a "pressing need to provide updated information on the current best available science to public health officials prior to finalization of the health effects assessment."[63]

---

[59] See Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances, 87 Fed. Reg. 36,848 (June 21, 2022).
[60] Id. 87 Fed. Reg. at 36,849.
[61] Drinking Water Health Advisories for PFAS Fact Sheet for Communities at pp. 1–2, EPA (June 2022), https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-communities.pdf.
[62] Drinking Water Health Advisories for PFAS Fact Sheet for Public Water Systems at p. 2, EPA (June 2022), https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-water-system.pdf.
[63] INTERIM Drinking Water Health Advisory: Perfluorooctanoic Acid (PFOA) CASRN 335-67-1 at p. 2, EPA (June 2022), https://www.epa.gov/system/files/documents/2022-06/interim-pfoa-2022.pdf; INTERIM Drinking Water Health Advisory: Perfluorooctanoic Acid (PFOS) CASRN 1763-23-1 at p. 2, EPA (June 2022), https://www.epa.gov/system/files/documents/2022-06/interim-pfos-2022.pdf.

40

COMPLAINT

197.    Because the referenced health analyses are still undergoing final review by the EPA's Science Advisory Board, the EPA has stated that the new interim HALs for PFOS and PFOA are subject to change. The EPA has indicated, however, that it does not anticipate any changes resulting in revised HALs for PFOS and PFOA that are greater than the 4.0 ppt minimum reporting level[64] that applies to public water systems.[65]

198.    On September 6, 2022, the EPA published a notice of proposed rulemaking seeking public comment on its plan to designate PFOS and PFOA as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA").[66]

199.    On January 6, 2023, the Defense Logistics Agency within the Department of Defense published a new Military Specification for *Fire Extinguishing Agent, Fluorine-Free Foam (F3) Liquid Concentrate, for Land-Based, Fresh Water Applications*, MIL-PRF-32725 ("F3 MilSpec") in accordance with FY 2020 NDAA section 332(a)(1).[67] This new specification will govern fire extinguishing foams used by all Department of Defense organizations and will require such foams to test "non-detect" for PFAS. The specification further requires manufacturers to "certify in writing that PFAS has not intentionally been added to the concentrate."[68]

---

[64] As the EPA's website explains, the Minimum Reporting Level ("MRL") for UCMR 5 is the minimum quantitation level that, with 95 percent confidence, can be achieved by capable analysts at 75 percent or more of the laboratories using a specified analytical method. The MRLs in the EPA's chart are based on the UCMR 5 requirement to use EPA Method 533.
[65] *See Drinking Water Health Advisories for PFAS Fact Sheet for Communities*, EPA (June 2022), https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-communities.pdf.
[66] *See* Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 87 Fed. Reg. 54,415 (Sept. 6, 2022).
[67] Fire Extinguishing Agent, Fluorine-Free Foam (F3) Liquid Concentrate, for Land-Based, Fresh Water Applications, Dep't of Defense (Jan. 6, 2023), https://quicksearch.dla.mil/qsDocDetails.aspx?ident_number=285047.
[68] *Id.* at p. 13.

41

COMPLAINT

200.  On April 8, 2024, the EPA promulgated a rule setting individual maximum contaminant levels ("MCLs")—legally mandated regulatory standards under the SDWA—for six PFAS chemicals.[69] The rule sets an MCL of 4.0 ppt for PFOA and PFOS, and an MCL of 10.0 ppt for PFHxS, PFNA, and HFPO-DA.[70] In addition to the MCLs for PFHxS, PFNA, and HFPO-DA, the rule also sets a Hazard Index of 1 (unitless) as the MCL for any mixture containing two or more of PFHxS, PFNA, HFPO-DA, and PFBS. This rule will require public water systems to monitor for these PFAS, notify the public of the levels of these PFAS, and reduce the levels of these PFAS in drinking water if they exceed these standards.

**H.    The State of California's PFAS Regulatory Response**

201.  On November 10, 2017, the California Office of Environmental Health Hazard Assessment ("OEHHA") added PFOA and PFOS to the list of chemicals known to the State to cause reproductive toxicity (developmental endpoint) for the purposes of The Safe Drinking Water and Toxic Enforcement Act of 1986, Health and Safety Code section 25249.5 *et seq.* ("Proposition 65").[71] On December 31, 2017, OEHHA also added PFNA and its salts to the list of chemicals known to cause reproductive toxicity.[72]

202.  In July 2018, following the recommendation of OEHHA, the California State Water Resources Control Board ("State Water Board") established Interim Notification Levels for PFOA and

---

[69] *See PFAS National Primary Drinking Water Regulation Rulemaking (Pre-Publication Version)*, EPA (Apr. 8, 2024), https://www.epa.gov/system/files/documents/2024-04/pfas-npdwr_prepubfederalregisternotice_4.8.24.pdf.
[70] *Id.*
[71] *Chemicals Listed Effective November 10, 2017 as Known to the State of California to Cause Reproductive Toxicity: Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)*, OEHHA (Nov. 9, 2017), https://oehha.ca.gov/proposition-65/crnr/chemicals-listed-effective-november-10-2017-known-state-california-cause.
[72] *Notice to Interested Parties Chemicals Listed Effective December 31, 2021 As Known to the State of California to Cause Reproductive Toxicity: Perfluorononanoic Acid (PFNA) and Its Salts*, OEHHA (Dec. 29, 2021), https://oehha.ca.gov/proposition-65/crnr/notice-interested-parties-chemicals-listed-effective-december-31-2021-known.

42

COMPLAINT

---

PFOS at 14 ppt and 13 ppt, respectively.[73] Notification Levels are non-regulatory health-based measures for concentrations in drinking water requiring public notification and further assessment.

203. In August 2019, the State Water Board lowered the Notification Levels for PFOA to 5.1 ppt and PFOS to 6.5 ppt in response to updated health recommendations from OEHHA.[74]

204. In February 2020, the State Water Board requested OEHHA to evaluate and recommend notification levels for seven additional PFAS compounds: PFHxS, PFBS, PFHpA, PFNA, perfluorohexanoic acid (PFHxA), perfluorodecanoic acid (PFDA), and 4,8-dioxia-3H-perflourononanoic acid (ADONA) based on the presence of these compounds being detected in public water supplies.[75]

205. On September 29, 2020, California Senate Bill ("SB") 1044 was signed into law, adding restrictions on the sale and use of class B firefighting foam containing intentionally added PFAS chemicals to the Health and Safety Code. SB 1044 introduced a ban, set to begin on January 1, 2022, prohibiting the manufacture, sale, and distribution of these firefighting foams within California, as well as limiting the use of these firefighting foams within California by any person. *See* Cal. Health & Safety Code § 13061(b)(1). SB 1044 includes an exception for class B firefighting foams for which the inclusion of PFAS chemicals is required by federal law, providing a one-year extension period after any such federal requirement is revoked. *Id.* § 13061(b)(2). SB 1044 also gives additional extensions in certain circumstances, including providing a two-year extension for facilities with fixed foam for suppression

---

[73] *State Water Board Releases Guidelines for Testing and Reporting on PFOA and PFOS in Drinking Water* at p. 1, State Water Board (July 13, 2018), https://www.waterboards.ca.gov/press_room/press_releases/2018/pr071318_pfoa_nl.pdf.
[74] *State Water Board Updates Guidelines for Testing and Reporting PFOA and PFOS As It Assesses Scope of Problem* at p. 1, State Water Board (Aug. 23, 2019), https://www.waterboards.ca.gov/press_room/press_releases/2019/pr082319_pfoa_pfos_guidelines_news_release.pdf.
[75] Letter D. Polhemus, Deputy Director Division of Drinking Water, to L. Zeise, Director Office of Environmental Health Haz, on Request for Notification Level Recommendations on Detected PFAS Analytes (Feb. 6, 2020), https://www.waterboards.ca.gov/drinking_water/certlic/drinkingwater/documents/pfos_and_pfoa/memo_nl_request_for_other_pfas.pdf.

43

COMPLAINT

systems that are designed for 110% containment of any discharge volume. *Id.* § 13061(b)(3).

206.    In July 2021, OEHHA released draft Public Health Goals for PFOA and PFOS in drinking water. A Public Health Goal represents the concentration of a contaminant in drinking water that is estimated to pose no significant health risk to individuals consuming the water on a daily basis over a lifetime. OEHHA proposed a draft Public Health Goal of 0.007 ppt for PFOA based on kidney cancer data in humans, and 1.0 ppt for PFOS based on liver and pancreatic tumor data from rat studies.[76]

207.    OEHHA added PFOS and PFOA to the list of chemicals known to the State to cause cancer for purposes of Proposition 65, in December 2021[77] and February 2022,[78] respectively.

**I.    Regulation of AFFF at Airports by the FAA**

208.    Commercial Service Airports are certified by the FAA under 14 C.F.R. Part 139, "Certification of Airports." 14 C.F.R. § 139 (2013). 14 C.F.R. sections 139.315 through .319 govern Aircraft Rescue and Firefighting ("ARFF") operations. Part 139 regulations require airports to use AFFF.

209.    The FAA issues "Advisory Circulars" providing guidance to airports for complying with Part 136 requirements. In 2004, the FAA issued Advisory Circular 150/5210-6D, which established requirements for AFFF use at Part 139 Certificated airports. AC 150/5210-6D incorporated a 1992 Department of Defense military specification, MIL-F-24385, requiring the use of AFFF containing perfluorinated surfactants. AC 150/5210-6D replaced the prior 1985 AC, 150/5210-6C. AC 150/5210-6C

---

[76] *Perfluorooctanoic Acid and Perfluorooctane Sulfonic Acid in Drinking Water* at p. 10, OEHHA (July 2021), https://oehha.ca.gov/media/downloads/crnr/pfoapfosphgdraft061021.pdf.

[77] *Notice to Interested Parties Chemicals Listed Effective December 24, 2021 As Known to the State of California to Cause Cancer: Perfluorooctane Sulfonic Acid (PFOS) and Its Salts and Transformation and Degradation Precursors*, OEHHA (Dec. 22, 2021), https://oehha.ca.gov/proposition-65/crnr/notice-interested-parties-chemicals-listed-effective-december-24-2021-known.

[78] *Notice to Interested Parties Chemical Listed Effective February 25, 2022 As Known to the State of California to Cause Cancer: Perfluorooctanoic Acid*, OEHHA (Feb. 25, 2022), https://oehha.ca.gov/proposition-65/crnr/notice-interested-parties-chemical-listed-effective-february-25-2022-known-state.

COMPLAINT

also required airports to use AFFF containing perfluorinated surfactants. AC 150/5210-6D remained in force until November 27, 2023.

210.    Additionally, in 2016, the FAA issued Order 5280.5D, Airport Certification Program Handbook (the "Handbook"), which also establishes requirements for airports to use AFFF as part of ARFF operations. In the 2016 update to the Handbook, the FAA reaffirmed the requirement that certificated airports must use AFFF containing PFAS to meet the firefighting capability requirements of Part 139. The 2016 Handbook was a replacement of the 2006 Handbook, Order 5280.5C. The 2006 Handbook included the same requirements for the use of AFFF in ARFF operations. Order 5280.5C was in turn a replacement for the 1994 Handbook, Order 5280.5B, which also included requirements that ARFF operations use AFFF. In addition to using AFFF in aircraft emergencies, Part 139 Certificated Airports have historically been required to deploy AFFF when training with and testing their ARFF systems, resulting in releases of AFFF.

211.    In 2018, Congress required the FAA to amend its requirements for Part 139 airports to allow the use of alternative non-fluorinated firefighting foams within three years. *See* FAA Reauthorization Act of 2018, Pub. L. No. 115-254, § 332 (2018).

212.    In January 2019, the FAA issued guidance addressing the use of AFFF in testing of AFFF systems, "CertAlert" No. 19-01. This voluntary guidance provided that the FAA would thereafter accept new AFFF testing systems that do not require the actual dispensing of foam onto the ground.

213.    In December 2022, Congress directed the FAA to develop a transition plan to ensure the orderly transition from AFFF to a replacement non-fluorinated firefighting foam.[79]

---

[79] Aircraft Firefighting Foam Transition Plan, FAA (May 8, 2023), https://www.faa.gov/sites/faa.gov/files/FAA_Aircraft_F3_Transition_Plan_2023.pdf.

45

COMPLAINT

214.    On January 12, 2023, following the publication of the new F3 MilSpec (*see supra* paragraph 199), the FAA issued "CertAlert" No. 23-01, informing Part 139 Certificated Airports that the FAA will accept the use of new fluorine-free foam ("F3") agents once the agent passes the new military performance standards, qualification testing, and is added to the Navy's Qualified Products Database.[80]

215.    On September 13, 2023, the FAA issued "CertAlert No. 23-07," informing Part 139 Certificated Airports that the Navy has begun populating their Qualified Products List/Database with approved F3 concentrates, meaning there are now F3 firefighting foams that meet Military Specifications that can be used on Part 139 Airports.[81]

216.    For decades, Part 139 Certificated Airports such as LAX, which were required to use AFFF in their ARFF operations, were unaware of the full extent of the environmental and health risks associated with using Defendants' AFFF Products containing PFOA and PFOS. Across the country, the use of AFFF at airports and similar sites has been linked to widespread PFAS contamination, including of surface and groundwater, as well as public drinking water wells. Now that the FAA has approved the use of F3 firefighting foams, the use of AFFF within Part 139 Certificated Airports' ARFF operations is expected to be phased out. As Part 139 Certificated Airports transition to F3 foams, they are faced with not only the cost of replacing AFFF and purchasing F3, but also the costs of cleaning and potentially replacing firefighting equipment, systems, and infrastructure to remove AFFF, and the costs of training personnel on the use of F3 products.

---

[80] New Military Specification for Performance-Based Standards for FluorineFree Aircraft Fire Fighting Foam, FAA (Jan. 12, 2023), https://www.faa.gov/sites/faa.gov/files/part-139-cert-alert-23-01-F3.pdf.
[81] *Availability of Fluorine Free Foam (F3) on the Navy's Qualified Products List (QPL)*, FAA (Sept. 13, 2023), https://www.faa.gov/sites/faa.gov/files/part_139_cert_alert_23_07_F3_Release.pdf.

COMPLAINT

J.     **AFFF Containing PFOS and PFOA Is Fungible and Commingled in the Groundwater.**

217.    AFFF containing PFOS and/or PFOA, once it has been released to the environment, lacks characteristics that would enable identification of the company that manufactured that particular batch of AFFF or chemical feedstock.

218.    A subsurface plume, even if it comes from a single location, such as a retention pond or fire training area, originates from mixed batches of AFFF and chemical feedstock coming from different manufacturers.

219.    Because precise identification of the specific manufacturer of any given AFFF/PFAS-Containing Product that was a source of the PFAS found at a particular location is nearly impossible, given certain exceptions, Plaintiffs must pursue all Defendants, jointly and severally.

220.    Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFOS and PFOA, to profit from the use of AFFF/PFAS-Containing Products containing PFOS and PFOA, at Plaintiffs' expense, and to attempt to avoid liability.

K.     **Defendants' AFFF/PFAS-Containing Products have caused, and continue to cause, widespread PFAS Contamination in and around Los Angeles.**

221.    Los Angeles is the second largest city in the United States by population, with almost four million residents.[82] Los Angeles covers nearly 500 square miles between the San Gabriel Mountains to the east and the Pacific Ocean to the west.[83]

---

[82] *QuickFacts: Los Angeles City, California, Population Estimates*, U.S. Census Bureau (July 1, 2022), https://www.census.gov/quickfacts/fact/table/losangelescitycalifornia/PST045223; *The 200 Largest Cities in the United States by Population 2024*, World Population Review, https://worldpopulationreview.com/us-cities (last visited Apr. 14, 2024).

[83] *City of Los Angeles*, L.A. Almanac, https://www.laalmanac.com/LA/index.php (last visited Apr. 14, 2024).

47

COMPLAINT

222.    Los Angeles, like many other cities, counties, and communities in the United States, is uncovering PFAS contamination associated with the use of Defendants' AFFF/PFAS-Containing Products. On information and belief, the use of Defendants' AFFF has contributed to the PFAS contamination throughout Los Angeles due to its use for decades at airports and firefighting training centers.

223.    There are dozens of airports and aviation facilities located in or adjacent to Los Angeles, including several Part 139 Certificated airports: LAX, Hollywood Burbank Airport, and Long Beach Airport. The City is the owner and the operator of LAX. Over the course of LAX's operations as a Part 139 Certificated airport, Defendants' AFFF products containing PFOS, PFOA, and/or their chemical precursors, have been used at LAX in connection with firefighting emergency response operations, during routine airport operations, as part of regulatory compliance requirements, and through incidental spills. The use of Defendants' AFFF products at LAX was as directed and intended by Defendants.

224.    PFAS, including PFOA and PFOS, have been detected in varying amounts and at varying times in the City's property and resources, including in the City's drinking water sources, groundwater, surface water, wastewater effluent and biosolids, soil, sediment, and landfill leachate. PFAS, including PFOA and PFOS, have been detected at levels exceeding the current and proposed state and federal advisory levels, including but not limited to the EPA's 2022 health advisory for PFAS in drinking water, the EPA's 2024 Maximum Contaminant Levels, and the State Water Board Division of Drinking Water's PFAS Notification Levels.

225.    The City is in the process of investigating the scope of PFAS contamination to its property and resources, including contamination connected to the use of AFFF. The City has incurred and will continue to incur substantial costs associated with its ongoing investigations, including relating to the

48

sampling of drinking water sources, groundwater and surface water supplies, and influent, effluent, biosolids, and leachate from its stormwater and wastewater treatment plants. In addition, the City has incurred and will continue to incur significant monitoring and treatment costs as it assesses and remediates PFAS contamination.

226.    The detection and/or presence of PFAS, including PFOA and PFOS, and the threat of further detection and/or presence of these chemicals, in the City's property and resources in varying amounts and at varying times has resulted, and will continue to result, in significant injury and damage to the City and its residents.

227.    The invasion of the City's property and resources with PFAS is ongoing, as these chemicals persist in the soils, sediment, groundwater, and surface water on the City's property and within its resources.

228.    Continuing investigation is necessary to ascertain the full scope of PFAS contamination in Los Angeles, including on the City's property, and to ensure that any City property or resources affected by AFFF and/or PFAS-containing products are safe. The City has incurred and will continue to incur substantial costs in connection with its ongoing investigations, monitoring, and community outreach, as well as costs associated with remediating PFAS contamination and making operational adjustments to comply with evolving PFAS regulatory requirements. Defendants are liable for the costs of such continued investigation and abatement.

229.    Through this action, the City seeks compensatory damages for the harm done to its property and resources, and for past, present, and future costs associated with investigating, remediating, and monitoring PFAS contamination caused by the use of Defendants' AFFF/PFAS-Containing Products.

        1.      The City's Public Water Supply System

49

COMPLAINT

230.    The City, through the Los Angeles Department of Water and Power ("LADWP"), owns and operates a large public water system that serves approximately four million residents and businesses, supplying about 400 million gallons of water per day ("MGD").

231.    The City obtains its drinking water from diverse sources, including groundwater wells, surface water transported through the Los Angeles Aqueduct, and wholesale surface water purchased from the Metropolitan Water District of Southern California ("MWD"), which in turn is sourced from the Colorado River and the Bay Delta (the Sacramento-San Joaquin River Delta and San Francisco Bay). LADWP purchases raw and untreated water as well as treated water from MWD.



**Sources of Drinking Water Supplies**[84]

232.    LADWP implements an extensive water quality monitoring program throughout the City's water system and its water sources, including testing for various PFAS compounds, to ensure high quality

---

[84] *Water System: Sources of Supply*, LADWP, https://www.ladwp.com/who-we-are/water-system/sources-supply (last visited Apr. 14, 2024).

COMPLAINT

water to all Los Angeles customers. LADWP is also in the process of testing and monitoring its water sources in accordance with a PFAS Monitoring Order issued by the State Water Board in 2022, and in accordance with UCMR 5.

233.    Through its investigations to date, LADWP has discovered PFAS contamination in certain groundwater wells, including PFOA at levels as high as 13 ppt and PFOS at levels as high as 23 ppt. The City is continuing to investigate and monitor the scope of PFAS contamination in the City's water system and its water sources.

234.    The City has also tested for and discovered PFAS contamination in its water sources beyond those currently employed for its public drinking water system, including effluent from the City's four water reclamation plants. The City's reclamation plants treat residential and commercial wastewater for a range of uses, including irrigation and other non-potable uses. The City's monitoring of PFAS contamination in wastewater is described further below at paragraphs 238 through 245.

235.    On average, the City sources around 8% of its drinking water from groundwater wells and relies on supplemental water purchased water from MWD for about half of its supply. The City plans to reduce reliance on MWD-purchased water and to develop new local water resources, including local groundwater, stormwater capture, water conservation and water use efficiency, and recycled water. The presence of PFAS in the City's groundwater and wastewater, as well as the threat of further detection and/or presence of these chemicals in each of the City's water sources, potentially jeopardizes a portion of the City's long-term water supply plan.

236.    The City has incurred and will continue to incur substantial costs associated with its ongoing PFAS investigations, including relating to the sampling of drinking water sources, groundwater and surface water supplies, and influent, effluent, biosolids, and leachate from its stormwater and

51

wastewater treatment plants. In addition, the City has incurred and/or will incur significant monitoring and treatment costs as it assesses and remediates PFAS contamination.

237.    Through this action, the City seeks compensatory damages for the harm done to its property and for past, present, and future costs associated with investigating, remediating, and monitoring PFAS contamination caused to its drinking water system by the use of Defendants' AFFF/PFAS-Containing Products.

**2.    The City's Wastewater and Stormwater Systems**

238.    The City, through LA Sanitation & Environment ("LASAN"), operates four water reclamation plants. These plants treat residential, commercial, and industrial sewage and wastewater to produce recycled water, with a combined capacity of 580 million gallons of recycled water per day.

239.    In July 2020, the State Water Board issued an order directing LASAN to sample and analyze 31 different PFAS compounds in influent, effluent, and biosolids from each of the City's water reclamation plants.[85]

240.    LASAN conducted testing of wastewater influent, effluent, and biosolids for each of these facilities under direction of the Los Angeles Regional Water Quality Control Board.

241.    The Hyperion Water Reclamation Plant ("HWRP") is the City's oldest and largest wastewater treatment facility, operating since 1894. HWRP represents LASAN's largest source of recycled water. LASAN has conducted testing and detected various PFAS, including PFOA and PFOS, in the wastewater influent, effluent, and biosolids from HWRP, including PFOS in untreated influent at concentrations as high as 31.7 ng/g (ppb).

---

[85] Water Code Sections 13267 and 13383 Order for the Determination of the Presence of Per- and Polyfluoroalkyl Substances at Publicly Owned Treatment Works, State Water Board (July 9, 2020), https://www.waterboards.ca.gov/board_decisions/adopted_orders/water_quality/2020/wqo2020_0015_dwq.pdf.

COMPLAINT

**The City's Hyperion Water Reclamation Plant**

242.    The City has set an objective to transform the HWRP to a recycled water facility to maximize beneficial reuse of reclaimed water. As part of this objective, the City is constructing two pilot advanced water treatment facilities at HWRP to perform advanced water treatment of primary effluent, which will include removal and monitoring of PFAS chemicals.

243.    The Donald C. Tillman Water Reclamation Plant ("DCTWRP") produces recycled water for use in the San Fernando Valley, in addition to providing a future source of recycled water for indirect potable reuse following completion of the DCT Advanced Water Purification Facility, which is expected in December 2027. LASAN has conducted testing and detected various PFAS, including PFOA and PFOS, in the wastewater influent and effluent from DCTWRP, including PFOA in effluent at concentrations as high as 28.8 ng/g (ppb).

244.    The Los Angeles-Glendale Water Reclamation Plant ("LAGWRP") is co-owned by the City of Los Angeles and the City of Glendale. LASAN has conducted testing and detected various PFAS, including PFOA and PFOS, in the wastewater influent, effluent, and biosolids from LAGWRP, including PFOA in effluent at a concentration of 6.94 ng/g (ppb).

COMPLAINT

245. The Terminal Island Water Reclamation Plant ("TIWRP") produces highly purified recycled water for use by Harbor Area industrial users and to recharge the Dominguez Gap Saltwater Intrusion Barrier, a series of injection wells that work to prevent seawater from mixing into the City's groundwater supplies of drinking water. LASAN has conducted testing and detected various PFAS, including PFOA and PFOS, in the wastewater influent, effluent, and biosolids from TIWRP, including PFOS in untreated influent at concentrations as high as 418 ng/g (ppb). The advanced treated water from this facility has tested non-detect for all tested PFAS.

246. The City will continue to incur costs relating to the sampling of influent, effluent, and biosolids for PFAS chemicals at each of its water reclamation plants, as well as to comply with permitting requirements for its wastewater and stormwater systems.

247. Through this action, the City seeks compensatory damages for the harm done to its property and for past, present, and future costs associated with investigating, remediating, treating, and monitoring PFAS contamination throughout the City's wastewater and stormwater systems caused by the use of Defendants' AFFF/PFAS-Containing Products.

### 3. Airport Properties

248. The City, through Los Angeles World Airports ("LAWA"), owns and operates two airports where AFFF has been stored, used, and discharged: VNY and LAX. The City also owns, through LAWA, the Palmdale Hangars where AFFF is used as part of the hangars' firefighting systems.

249. VNY is a general aviation airport located in the San Fernando Valley, approximately 20 miles northwest of downtown Los Angeles. VNY opened in 1928 and was purchased by the City from the War Assets Administration in 1949 following the Second World War. Today, VNY is dedicated to

54

COMPLAINT

non-commercial air travel and ranks as one of the world's business general aviation airports, with hundreds of thousands of takeoffs and landings each year.

250.    LAX is a commercial airport located at the western edge of Los Angeles on 3,818 acres of land. LAX is a large hub to many major airlines.[86] LAX has been in use for general and military aviation since the 1920s and has been used for commercial air travel since the mid-1940s.[87]

251.    Based on number of passengers, LAX is the fourth busiest airport in the world and second busiest airport in the United States.[88] In 2018, 78.5 million passengers flew through LAX.[89]



**Los Angeles International Airport (LAX)**

---

[86] Richard P. Kraft, *Per- and Polyfluoroalkyl Substances (PFAS) Investigation Work Plan for Los Angeles International Airport* at p. 2, Geosyntec Consultants (May 30, 2019), https://documents.geotracker.waterboards.ca.gov/esi/uploads/geo_report/7952017009/T10000012773.PDF; *LAX Airport - Los Angeles Airport*, L.A. Airport, https://www.los-angeles-airport.com/lax (last visited Apr. 14, 2024).
[87] Richard P. Kraft, *Per- and Polyfluoroalkyl Substances (PFAS) Investigation Work Plan for Los Angeles International Airport* at p. 2, Geosyntec Consultants (May 30, 2019), https://documents.geotracker.waterboards.ca.gov/esi/uploads/geo_report/7952017009/T10000012773.PDF.
[88] *LAX History: Just the Facts*, L.A. World Airports, https://www.lawa.org/history/lax-history/just-the-facts (last visited Apr. 14, 2024).
[89] *Id.*

COMPLAINT

252.     As a Part 139 Certificated Airport, LAX has, for decades, been required to use AFFF in its firefighting operations. Until recently, Part 139 airports were required to use AFFF that meets the specifications of MIL-PRF-24385. In addition to using AFFF in aircraft emergencies, Part 139 airports were historically required to train with and test their aircraft rescue and firefighting ("ARFF") systems, which has resulted in releases of AFFF at LAX.

253.     The Los Angeles Fire Department ("LAFD") uses AFFF in their firefighting operations at both LAX and VNY. The LAFD first used AFFF manufactured by Defendant 3M at LAX in 1973.[90] In addition to the use of AFFF as a fire-extinguishing agent, LAFD has used AFFF at Fire Drill sites at LAX as part of its equipment readiness procedures for fire training purposes. Over the course of the airport's operations, Defendants' AFFF/PFAS-Containing Products containing PFOS, PFOA, and/or their chemical precursors, have been used at LAX in connection with these Fire Drill Sites. During fire training operations at the Former Fire Drill site, AFFF was released directly into soils to extinguish fires during each drill. Application of AFFF at the Current Fire Drill site may have also resulted in the contamination of soil and property at LAX with AFFF.

254.     AFFF has also been, and continues to be, stored at a number of locations throughout the Airport Properties by LAWA, the LAFD, and other tenants of LAWA.

255.     LAWA is now in the process of phasing out the use of AFFF at the Airport Properties. Use of AFFF within firefighting operations at the Airport Properties is expected to be transitioned to F3 in the near future, in accordance with the directive in SB 1044, once approved F3 products become available in the required quantities for LAFD's operations and following the cleaning or even replacement of

---

[90] Richard P. Kraft, *Per- and Polyfluoroalkyl Substances (PFAS) Investigation Work Plan for Los Angeles International Airport* at p. 3, Geosyntec Consultants (May 30, 2019), https://documents.geotracker.waterboards.ca.gov/esi/uploads/geo_report/7952017009/T10000012773.PDF.

56

COMPLAINT

1  firefighting equipment, systems, and infrastructure to remove traces of AFFF, and training personnel on

2  the use of F3 products.

3      256.    In 2019, LAWA received an order from the State Water Board directing all commercial

4  airports in California, including LAX, to investigate the extent of PFAS contamination caused by AFFF.

5  Prior to the 2019 order, LAWA had conducted PFAS testing of groundwater on its property at two sites

6  in and near LAX and detected PFAS at both sites. Since the 2019 order, LAWA has been conducting

7  further groundwater, surface water, and soil testing for PFAS at various sites within LAX, including at

8  sites of known AFFF releases such as a crash site and Fire Drill sites, and including pursuant to additional

9  orders issued by the State Water Board. To date, the City has spent almost $800,000 on consultant costs

10  alone conducting these investigations.

11      257.    On information and belief, the use of Defendants' AFFF products at the Airport Properties

12  for fire protection and emergency response activities has led to contamination of the City's property from

13  PFOA, PFOS, and other PFAS chemicals. The use of Defendants' AFFF products at the Airport Properties

14  was as directed and intended by Defendants.

15      258.    Through this action, the City seeks compensatory damages for the harm done to its property

16  and past and future costs associated with investigating, remediating, and monitoring PFAS contamination

17  caused by the use of AFFF and PFAS-Containing Products at the Airport Properties, and at various sites

18  throughout Los Angeles, including the costs of removal, cleaning, and/or replacing equipment and

19  infrastructure contaminated with AFFF and related costs of transition to replacement products.

57

COMPLAINT

1

2

### V.  MARKET SHARE LIABILITY, ALTERNATIVE LIABILITY, CONCERT OF ACTION, AND ENTERPRISE LIABILITY

3

4

5

6

7

8

259.   Defendants in this action are manufacturers that control a substantial share of the market for AFFF/PFAS-Containing Products and are jointly responsible for the contamination of the City's property, including the soil, sediment, surface water, groundwater, stormwater, and other natural resources and property within Los Angeles. Market share liability attaches to all Defendants and the liability of each should be assigned according to its percentage of the market for AFFF/PFAS-Containing Products at issue in this Complaint.

9

10

11

12

13

260.   Because PFAS is fungible, it is impossible to identify the exact Defendant who manufactured any given AFFF/PFAS-Containing Products found free in the air, soil, surface water, or groundwater. On information and belief, the Defendants participated in a national market for AFFF/PFAS-Containing Products during the relevant time.

14

15

16

17

261.   Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts alleged herein and each of which acted tortuously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF/PFAS-Containing Products.

18

19

262.   Enterprise liability attaches to all the named Defendants for casting defective products into the stream of commerce.

20

### VI.  CAUSES OF ACTION

21

22

### FIRST CAUSE OF ACTION
#### Public Nuisance—Abatement
**(Against the AFFF Defendants, the DuPont Defendants, and Dynax)**

23

#### Cal. Civ. Proc. Code § 731

24

25

26

263.   The People adopt, reallege, and incorporate the allegations set forth in paragraphs 1 through 262 above, and further allege the following:

27

58

COMPLAINT

264.    The People bring this claim pursuant to Civil Procedure Code section 731, to abate a public nuisance as defined in Civil Code sections 3479 and 3480.

265.    Under Civil Code section 3479, a nuisance is defined as, *inter alia*, "[a]nything which is injurious to health," including, but not limited to, "an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway." Cal. Civ. Code § 3479.

266.    Pursuant to Civil Code section 3480, a public nuisance is a nuisance "which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." Cal. Civ. Code § 3480.

267.    PFAS contamination substantially and unreasonably interferes with public health and with rights common to the general public. The residents of Los Angeles have a right to be free from conduct that is injurious to their health and welfare. The City has an obligation to provide its residents with safe and clean drinking water that meets all federal and state regulatory standards.

268.    Through the production, marketing, and sale of their AFFF/PFAS-Containing Products, as alleged above, each Defendant has created or assisted in the creation of a public nuisance. The presence of PFAS in the City's property and natural resources is injurious to the health and safety of Los Angeles and its residents, unlawfully obstructs the free use of the City's groundwater, surface water, soil, sediment, wastewater, stormwater, public drinking water systems, and other natural resources and property, and interferes with the comfortable enjoyment of life and property of entire communities and/or neighborhoods in the City.

COMPLAINT

269.   Defendants' conduct and the presence of PFAS in the City's property and natural resources has affected a substantial number of people at the same time. PFAS contamination is present throughout Los Angeles, including in its groundwater, surface water, soil, sediment, wastewater, stormwater, and other natural resources and property. PFAS contamination has also been detected in sources of drinking water for the residents of Los Angeles. Through the production, marketing, and sale of AFFF/PFAS-Containing Products, Defendants have unreasonably interfered with the public's free use and comfortable enjoyment of the City's property and natural resources. By creating a substantial risk to human health and the environment, Defendants' conduct injures the general public and all residents of Los Angeles.

270.   Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious disregard for the reasonably foreseeable impact on the environment and public health and welfare.

271.   Defendants knew or should have known that their conduct would cause their AFFF/PFAS-Containing Products to end up in the City's groundwater, surface water, soil, sediment, wastewater, stormwater, public drinking water systems, and/or other natural resources and property when used as intended.

272.   Defendants knew or should have known that this interference with public rights was substantially certain to result from their conduct.

273.   Defendants improperly marketed, produced, and/or sold their AFFF/PFAS-Containing Products for uses that would inevitably cause harmful environmental contamination. And Defendants failed to provide adequate warnings and instructions for use and disposal to protect against the risk to public health and the environment caused by the ordinary and anticipated use and disposal of their products.

60

274.    As a direct and proximate result of the nuisance, the People have suffered and will continue to suffer significant injuries, including loss of use and enjoyment of the City's property and natural resources.

275.    An ordinary person would be reasonably annoyed or disturbed by the presence of PFAS in groundwater, surface water, soil, sediment, wastewater, stormwater, public drinking water systems, and other natural resources and property.

276.    The seriousness of the harm to the environment and human health caused by Defendants' conduct far outweighs any social utility of Defendants' production, marketing, and sale of their AFFF/PFAS-Containing Products.

277.    The seriousness of the infringement on the public's right to free use of its natural resources and property, including its public drinking water systems, far outweighs any social utility of Defendants' conduct.

278.    Plaintiffs did not consent to Defendants' conduct. Indeed, Defendants repeatedly concealed the dangers posed to human health and the environment by AFFF/PFAS-Containing Products.

279.    Defendants' conduct was a substantial factor in causing these harms.

280.    These harms are reasonably abatable.

281.    The People seek an order from the Court, pursuant to Civil Procedure Code section 731, requiring Defendants to abate the public nuisance alleged herein.

61

COMPLAINT

**SECOND CAUSE OF ACTION**
**Public Nuisance—Damages**
**(Against the AFFF Defendants, the DuPont Defendants, and Dynax)**

**Cal. Civ. Proc. Code § 731**

282.  The City adopts, realleges, and incorporates the allegations set forth in paragraphs 1 through 281 above, and further alleges the following:

283.  The City brings this cause of action pursuant to Civil Procedure Code section 731, to recover damages for losses incurred as a result of Defendants' conduct.

284.  The City is the owner, operator, and actual possessor of real property and improvements throughout Los Angeles.

285.  PFAS contamination substantially and unreasonably interferes with public health and with rights common to the general public. The residents of Los Angeles have a right to be free from conduct that is injurious to their health and welfare. The City has an obligation to provide its residents with safe and clean drinking water that meets all federal and state regulatory standards.

286.  Defendants' conduct has created a public nuisance which has adversely impacted, and continues to adversely impact, the City's property, including its groundwater, surface water, soil, sediment, wastewater, stormwater, public drinking water systems, and other natural resources and property which the City owns or manages, or for which the City has a responsibility to safeguard.

287.  Through the production, marketing, and sale of their AFFF/PFAS-Containing Products, as alleged above, each Defendant has created or assisted in the creation of a public nuisance. The presence of PFAS in the City's property and natural resources is injurious to the health and safety of Los Angeles and its residents, unlawfully obstructs the free use of the City's groundwater, surface water, soil, sediment, wastewater, stormwater, public drinking water systems, and other natural resources and property, and

62

COMPLAINT

interferes with the comfortable enjoyment of life and property of entire communities and/or neighborhoods in the City.

288.    Defendants' conduct and the resulting presence of PFAS in the City's property, drinking water systems, and other natural resources have affected a substantial number of people at the same time. Defendants have created a significant risk to human health and the environment throughout Los Angeles.

289.    Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious disregard for the reasonably foreseeable impact on the environment and public health and welfare.

290.    Defendants knew or should have known that their conduct would cause their AFFF/PFAS-Containing Products to end up in the City's groundwater, surface water, soil, sediment, wastewater, stormwater, public drinking water systems, and other natural resources and property when used as intended.

291.    Defendants knew that this interference with public rights was substantially certain to result from their conduct.

292.    Defendants improperly marketed, produced, and sold their AFFF/PFAS-Containing Products for uses that would inevitably cause harmful environmental contamination and failed to provide adequate warnings and instructions for use and disposal to protect against the risk to public health and the environment caused by the ordinary and anticipated use and disposal of their products.

293.    As a direct and proximate result of the public nuisance, the City has suffered and will continue to suffer substantial damages related to PFAS contamination, including incurring costs in connection with the monitoring, assessment, analysis, control, reduction, and/or elimination of PFAS contamination, including through the taking of remedial measures and response actions to prevent PFAS

63

contamination of drinking water and the environment and to minimize the discharge of PFAS through City water.

294.    The seriousness of the harm to the environment and human health far outweighs the social utility of Defendants' conduct in the production, marketing, and sale of AFFF/PFAS-Containing Products. The conditions resulting from Defendants' conduct unreasonably interfere with the public right to water and natural resources free of toxins.

295.    The harm resulting from this interference is severe and greater than the City and the public should be required to bear without compensation. The harm suffered by the City is different from the type of harm suffered by the general public.

296.    The City did not consent to Defendants' conduct. Indeed, Defendants repeatedly concealed the dangers posed to human health and the environment by AFFF/PFAS-Containing Products.

297.    Defendants' conduct was a substantial factor in causing the City's harm.

298.    The City seeks recovery of all damages available under law.

### THIRD CAUSE OF ACTION
#### Negligence
**(Against the AFFF Defendants, the DuPont Defendants, and Dynax)**

299.    The City adopts, realleges, and incorporates the allegations set forth in paragraphs 1 through 298 above, and further alleges the following:

300.    As manufacturers of AFFF/PFAS-Containing Products, Defendants owed a duty to the City and to all persons whom its products might foreseeably harm and to exercise due care in the formulation, manufacture, marketing, sale, labeling, warning, instructions for use, and use of AFFF/PFAS-Containing Products.

COMPLAINT

301.    Defendants owed a duty to provide adequate warnings of the risks of their AFFF/PFAS-Containing Products to all persons whom their products might foreseeably harm, including the City and the public.

302.    Defendants were negligent per se because, by their actions and omissions, Defendants breached their duty of care by violating Civil Code sections 3479 and 3480, as alleged in the First, Second, and Third causes of action, which allegations are incorporated by reference herein as if set forth in full. Pursuant to Evidence Code section 669, this violation of Civil Code sections 3479 and 3480 creates a presumption that Defendants failed to exercise due care.

303.    Under Evidence Code section 669, the "failure of a person to exercise due care is presumed if: (1) He violated a statute, ordinance, or regulation of a public entity; (2) The violation proximately caused death or injury to person or property; (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted." Cal. Evid. Code § 669.

304.    As alleged in the First, Second, and Third causes of action, Defendants violated Civil Procedure Code sections 3479 and 3480 by producing, marketing, and selling AFFF/PFAS-Containing Products, which Defendants knew or should have known would cause widespread harm to the City's property, the health of residents of Los Angeles, and to the environment. Defendants' acts and omissions in producing, marketing, and selling AFFF/PFAS-Containing Products injured the City.

305.    The harms caused by Defendants' acts and omissions in producing, marketing, and selling their AFFF/PFAS-Containing Products—namely, the contamination of the City's groundwater, surface water, soil, sediment, wastewater, stormwater, public drinking water systems, and other natural resources

65

and property, as well as the risk of environmental harm and loss of use of property due to the widespread contamination caused by these dangerous chemicals— are the types of harms that the California nuisance statutes, Civil Procedure Code sections 3479 and 3480, were designed to protect.

306.   The City is of the class of persons for whom the statute was designed to protect.

307.   Defendants, by violating Civil Procedure Code sections 3479 and 3480, as well as by their other negligent acts, failed to use due care in the production, manufacture, marketing, and sale of their AFFF/PFAS-Containing Products. These acts were a direct and proximate cause of harm to property and natural resources in the City.

308.   Defendants owed a duty to the City to act reasonably and not place inherently dangerous AFFF/PFAS-Containing Products into the marketplace when its release into the air, soil, and water was imminent and certain.

309.   Defendants knew or reasonably should have known that their AFFF/PFAS-Containing Products were dangerous or likely to be dangerous when used in their intended or reasonably foreseeable manner.

310.   Defendants knew or reasonably should have known that PFAS would leach into surface and ground water from AFFF used for firefighting training and emergency response activities, and federally mandated testing of firefighting equipment.

311.   Defendants knew or reasonably should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and highly likely to become a persistent pollutant if released into the environment.

312.   Defendants knew or reasonably should have known that the manner in which they were designing, manufacturing, marketing, distributing, and selling their AFFF/PFAS-Containing Products

66

COMPLAINT

would result in contamination of the City's public drinking water systems and other property.

313.   Despite the fact that Defendants knew or reasonably should have known that PFAS are toxic, can contaminate the environment, and are carcinogenic, Defendants negligently:

A.     designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold AFFF/PFAS-Containing Products;

B.     issued deficient instructions on how their AFFF/PFAS-Containing Products should be used and disposed of, thereby permitting PFAS to contaminate soils, sediment, groundwater, and surface water in and around Los Angeles;

C.     failed to recall and/or warn the users of their AFFF/PFAS-Containing Products of the dangers of contamination as a result of standard use and disposal of their products;

D.     failed and refused to issue the appropriate warning and/or recalls to the users of their AFFF/PFAS-Containing Products;

E.     failed to provide instructions on the safe and proper disposal of their AFFF/PFAS-Containing Products; and

F.     failed to take reasonable, adequate, and sufficient steps or actions to eliminate, correct, or remedy any contamination after it occurred.

314.   Defendants knew or reasonably should have known that users of their AFFF/PFAS-Containing Products would not realize the dangers associated with these products. Without adequate warnings and instructions, Defendants' AFFF/PFAS-Containing Products were unsafe beyond the level which would be contemplated by an ordinary user.

315.   A reasonably prudent manufacturer under the same or similar circumstances, when presented with the risks of harm associated with AFFF/PFAS-Containing Products, would not continue to

COMPLAINT

manufacture that product or would take steps to properly warn the City of its dangers and associated risks and/or instruct the City on ways to safely use and dispose of its product to mitigate the associated harm.

316.    The magnitude of the burden on the Defendants to guard against this foreseeable harm to the City was minimal, as the practical consequences of placing this burden on the Defendants amounted to a burden to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF/PFAS-Containing Products.

317.    As manufacturers, Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF/PFAS-Containing Products, and to take steps to eliminate, correct, or remedy any contamination they caused.

318.    Had Defendants provided adequate warnings and instructions, the City would have taken measures to avoid or mitigate the adverse impacts to the City's property as well as to human health and the environment.

319.    As a direct and proximate result of Defendants' negligence, the City has suffered, and will continue to suffer, damage to its property from PFAS contamination requiring investigation, remediation, and monitoring costs, including the costs of replacing and cleaning equipment contaminated with PFAS.

320.    Defendants' failure to warn or provide instructions as to the safe and proper use and disposal of AFFF/PFAS-Containing Products was a substantial factor in causing the City harm.

321.    Defendants knew that it was substantially certain that their acts and omissions described above would result in damage to the City's property from PFAS contamination. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of the public, and/or the City's property rights.

68

COMPLAINT

322.    As a result, the City has suffered and will continue to suffer damages in amounts to be proven at trial.

<div align="center">

**FOURTH CAUSE OF ACTION**
**Defective Design—Strict Products Liability**
**(Against all Defendants)**

</div>

323.    The City adopts, realleges, and incorporates the allegations set forth in paragraphs 1 through 322 above, and further allege the following:

324.    The City asserts this cause of action in its proprietary capacity as the real property owner and possessor of the City's wastewater treatment systems, stormwater systems, public drinking water systems, and other property, including but not limited to the Airport Properties.

325.    Defendants produced, manufactured, marketed, and sold their AFFF/PFAS-Containing Products. Defendants owed a duty to all persons and entities whom their products might foreseeably harm, including the City, and a duty not to market any product which is unreasonably dangerous in design for its intended and reasonably anticipated use.

326.    Defendants' AFFF/PFAS-Containing Products were unreasonably dangerous for their reasonably anticipated uses for the following reasons:

A.      PFAS cause extensive contamination, even when used in their foreseeable and intended manner;

B.      PFAS pose significant threats to public health;

C.      PFAS create real and potential environmental damage; and

D.      PFAS contamination is pervasive and PFAS is extremely persistent in the environment, such that remediation is both challenging and costly.

COMPLAINT

327.    Defendants knew or should have known of these risks and failed to use reasonable care in the design of their AFFF/PFAS-Containing Products.

328.    Defendants' AFFF/PFAS-Containing Products were unreasonably dangerous as designed and manufactured because, even when used as intended, such products would pose a danger to human health and the environment.

329.    Defendants' AFFF/PFAS-Containing Products were not reasonably safe as designed at the time the products left Defendants' control.

330.    Defendants' AFFF/PFAS-Containing Products pose a greater danger to the environment and to human health when used in the intended and foreseeable way than would be expected by ordinary persons such as the City and the general public.

331.    At all times, Defendants were capable of making AFFF/PFAS-Containing Products that did not contain PFOS, PFOA, and/or their chemical precursors. Thus, reasonable alternative designs existed which were capable of preventing the City's injuries.

332.    Defendants placed AFFF/PFAS-Containing Products into the stream of commerce in a defective and unreasonably dangerous condition. The PFAS compounds released from these products reached the City's groundwater, surface water, soil, sediment, wastewater, stormwater, and property, including the City's public water systems, and other natural resources without any substantial change in condition, and were in the same condition at the time of the alleged injury to the City's resources and properties. The City used Defendants' AFFF/PFAS-Containing Products in their intended manner.

333.    The risk of harm and environmental contamination from PFAS was foreseeable to Defendants or a reasonable manufacturer.

70

COMPLAINT

334. The likelihood that Defendants' AFFF/PFAS-Containing Products would be spilled, discharged, disposed of, or released into the environment and cause harmful and adverse impacts to the environment and human health, far outweighed any burden on Defendants to adopt an alternative design. The substantial and foreseeable risks of harm to human health and the environment far outweigh the products' utility as a flame-control product and outweigh the adverse effect, if any, of such alternative design on the utility of the product.

335. As a direct and proximate result of Defendants' unreasonably dangerous design, manufacture, and sale of AFFF/PFAS-Containing Products, the City has incurred and will continue to incur costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of PFAS contamination within Los Angeles, as well as costs and expenses related to the treatment and remediation. Defendants' unreasonably dangerous design, manufacture, and sale of AFFF/PFAS-Containing products was a substantial factor in causing harm to the City.

336. Defendants knew or should have known that it was substantially certain that their acts and omissions described above would cause significant injury and damage to the City, including by preventing the City and its citizens from fully utilizing the City's property, including its water rights. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the public's health and safety, and/or the City's property rights.

337. The City has suffered and will continue to suffer damages from injuries caused by Defendants' conduct.

338. Defendants are strictly liable for all damages arising out of their defectively designed AFFF/PFAS-Containing Products.

71

## FIFTH CAUSE OF ACTION
### Failure to Warn—Strict Products Liability
### (Against all Defendants)

339. The City adopts, realleges, and incorporates the allegations set forth in paragraphs 1 through 338 above, and further alleges the following:

340. The City asserts this cause of action in its proprietary capacity as the real property owner and possessor of the City's wastewater treatment systems, stormwater systems, public drinking water systems, and other property, including but not limited to the Airport Properties.

341. Defendants produced, marketed, and sold their AFFF/PFAS-Containing Products.

342. Defendants' AFFF/PFAS-Containing Products had potential risks that were known or knowable by Defendants in light of the scientific knowledge that was generally accepted in the scientific community at the time of production, manufacture, and sale.

343. Defendants' AFFF/PFAS-Containing Products were unreasonably dangerous for their reasonably anticipated uses for the following reasons:

A. PFAS cause extensive contamination, even when used in their foreseeable and intended manner;

B. PFAS pose significant threats to public health; and

C. PFAS create real and potential environmental damage; and

D. PFAS contamination is pervasive and PFAS is extremely persistent in the environment, such that remediation is both challenging and costly.

344. At the time Defendants produced, marketed, and sold their AFFF/PFAS-Containing Products, Defendants knew or should have known of the health and environmental risks associated with their products and failed to provide a warning that would lead an ordinary reasonable user or handler of a

72

product to contemplate the dangers associated with their products or an instruction that would have avoided the City's injuries.

345. Defendants' AFFF/PFAS-Containing Products, when used as intended or in a reasonably foreseeable manner, posed a substantial risk of contamination and harm to the City's public drinking water systems, other property, and natural resources.

346. An ordinary consumer would not have recognized the potential risks and harms associated with Defendants' AFFF/PFAS-Containing Products.

347. Despite the fact that Defendants knew or should have known of the environmental and human health hazards associated with the use and/or disposal of their AFFF/PFAS-Containing Products in the vicinity of groundwater, surface water, soil, sediment, wastewater, stormwater, property, and other natural resources, Defendants failed to issue any warnings, instructions, recalls, or advice regarding their AFFF/PFAS-Containing Products to the City, other governmental agencies, or the public.

348. Despite the fact that Defendants knew or should have known of the pervasive and persistent nature of PFAS contamination, Defendants failed to provide adequate instructions on the safe and proper disposal of AFFF/PFAS-Containing Products.

349. Defendants' AFFF/PFAS-Containing Products were not reasonably safe as they lacked adequate warnings at the time the product left Defendants' control.

350. Defendants placed their AFFF/PFAS-Containing Products in the stream of commerce without warnings sufficient and necessary for the safe and proper use and disposal of their products. In failing to include proper warnings and instructions, Defendants placed AFFF/PFAS-Containing Products in the stream of commerce in a defective and unreasonably dangerous condition.

73

COMPLAINT

351.   Defendants' AFFF/PFAS-Containing Products reached the City's groundwater, surface water, soil, sediment, wastewater, stormwater, property, including public drinking water systems, and natural resources without any substantial change in condition, and were in the same condition at the time of the alleged injury to the City's Property.

352.   Had Defendants provided adequate warnings and instructions, the City would have taken measures to avoid or mitigate the adverse impacts of PFAS contamination.

353.   As a direct and proximate result of Defendants' failure to warn, the City was harmed and suffered, and will continue to suffer, damage to its property from PFAS contamination requiring investigation, remediation, and monitoring costs, including the costs of replacing and cleaning equipment contaminated with Defendants' AFFF/PFAS-Containing Products.

354.   Defendants' failure to provide adequate warnings and instructions was a substantial factor in causing the City's harm.

355.   Defendants are strictly liable for all damages arising out of their failure to provide adequate warnings and instructions.

<div style="text-align:center">

**SIXTH CAUSE OF ACTION**
**Fraudulent Transfer**
**(Against the DuPont Defendants)**

**Pursuant to Cal. Civ. Code § 3439, *et seq.***

</div>

356.   The City adopts, realleges, and incorporates the allegations set forth in paragraphs 1 through 355 above, and further alleges the following:

357.   The City seeks relief under either or both of the Uniform Fraudulent Transfer Act, Civil Code section 3439 (2015) ("UFTA"), and the superseding Uniform Voidable Transactions Act, Civil Code section 3439 (2022) ("UVTA"), both of which were in effect at different times over the period when the

COMPLAINT

relevant transactions between the DuPont Defendants took place, as alleged in paragraphs 160 through 175 above.

358.     Pursuant to both the UFTA, Civil Code section 3439.04 (2015) and the UVTA, Civil Code section 3439.04 (2022):

>   (a) A transfer made or obligation incurred by a debtor is [fraudulent/voidable] as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation as follows:
>
>>   1.  With actual intent to hinder, delay, or defraud any creditor of the debtor.
>>
>>   2.  Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:
>>
>>>   A.  Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.
>>>
>>>   B.  Intended to incur, or believed or reasonably should have believed that [the debtor/he or she] would incur, debts beyond [the debtor's/his or her] ability to pay as they became due.

Cal. Civ. Code § 3439.04 (2015 & 2022).

359.     The City is a "Creditor" holding "Claims" against the DuPont Defendants as those terms are defined in the UVTA, Civil Code section 3439.01 (2022), and the UFTA, Civil Code section 3439.01 (2015).

360.     As alleged in paragraphs 160 through 175 above, the DuPont Defendants have engaged in a series of transactions in an effort to shield assets from, and otherwise hinder or delay, the City and other creditors.

75

COMPLAINT

**A.      Actual Fraudulent Transfer (Cal. Civ. Code § 3439.04(a)(1))**

361.    Through their effectuation of the Chemours Spin-off in July 2015, Chemours Co. and Old DuPont caused Chemours Co. to transfer valuable assets to Old DuPont, including but not limited to the Transfers, while simultaneously taking on the Assumed Liabilities.

362.    The Transfers and Assumed Liabilities were made for the benefit of Old DuPont.

363.    At the time that the Transfers were made and the Liabilities were assumed, and until the spin-off was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours Co.

364.    Chemours Co. and Old DuPont made the Transfers and incurred the Assumed Liabilities with the actual intent to hinder, delay, and defraud the creditors or future creditors of Chemours Co.

365.    Old DuPont and Chemours were engaged in acts in furtherance of a scheme to transfer Chemours Co.'s assets out of the reach of parties, who have been harmed as a result of these actions.

366.    The City has been harmed as a result of the conduct of Chemours Co. and Old DuPont.

367.    The City is entitled to avoid the Transfers, to recover property or value transferred from Chemours Co. to Old DuPont, or to hold Old DuPont jointly and severally liable for any damages or other remedies against Chemours Co. that may be awarded by the Court or jury.

368.    The DuPont Defendants have further acted with actual intent to hinder, delay, and defraud the City and other parties in connection with the Post-Merger Transactions.

369.    Through the Dow-DuPont Merger and the separations of New DuPont, Dow, Inc., and Corteva, Inc., Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva, Inc. and New DuPont.

COMPLAINT

370.     On information and belief, Corteva, Inc. and New DuPont assumed the liability of Old DuPont.

371.     The Post-Merger Transactions were made for the benefit of Corteva, Inc. and New DuPont.

372.     At the time that the Post-Merger Transactions were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

373.     Old DuPont, New DuPont, and Corteva, Inc. acted with the actual intent to hinder, delay, and defraud creditors and future creditors.

374.     Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties, who have been harmed as a result of these actions.

375.     The City has been harmed as a result of the Post-Merger Transactions.

376.     The City is entitled to avoid the Post-Merger Transactions, to recover property or value transferred from Old Dupont to New DuPont and/or Corteva, Inc., or to hold New DuPont and Corteva, Inc. jointly and severally liable for any damages or other remedies against Old DuPont that may be awarded by the Court or jury.

377.     Pursuant to Civil Code section 3439 *et seq.*, the City seeks, to the extent necessary to satisfy the City's claims, the attachment or other provisional remedy against the assets transferred to Old DuPont and the incurrence of obligations to Old DuPont in the Chemours Spin-Off, or the proceeds of assets now held by New DuPont and/or Corteva, Inc.

378.     The City further reserves such other rights and remedies that may be available under Civil Code section 3439, *et seq.* and/or such other applicable state law as may be necessary to fully compensate the City.

COMPLAINT

**B.   Constructive Fraudulent Transfer (Cal. Civ. Code § 3439.04(b)(5))**

379.   Through the Chemours Spinoff, Old DuPont and Chemours Co. caused Chemours Co. to make the Transfers while simultaneously taking on the Assumed Liabilities without receiving a reasonably equivalent value in exchange therefor when (i) Chemours Co. engaged or was about to engage in a business or a transaction for which the remaining assets of Chemours Co. were unreasonably small in relation to the business, and/or (ii) they intended Chemours Co. to incur, or believed or reasonably should have believed that Chemours Co. would incur, debts beyond its ability to pay as they became due.

380.   The Transfers and Assumed Liabilities were made for the benefit of Old DuPont.

381.   At the time that the Transfers were made and the Liabilities were assumed, and until the spin-off was complete, Old DuPont was in a position to, and in fact did, control and dominate Chemours Co.

382.   At the time the Transfers were made and the Liabilities were assumed, Chemours Co. was engaged or about to be engaged in a business where its remaining assets were unreasonably small in relation to its business and debt obligations.

383.   At the time that the Transfers were made and the Liabilities were assumed, Chemours Co. and Old DuPont believed or reasonably should have been believed that Chemours Co. would incur debts beyond its ability to pay as they became due.

384.   Old DuPont and Chemours engaged in acts in furtherance of a scheme to transfer Chemours Co.'s assets out of the reach of parties, who have been harmed as a result of these actions.

385.   The City has been harmed as a result of the conduct of Chemours Co. and Old DuPont.

386.   The City is entitled to avoid the Transfers, to recover property or value transferred from Chemours Co. to Old DuPont, or to hold Old DuPont jointly and severally liable for any damages or other

COMPLAINT

remedies against Chemours Co. that may be awarded by the Court or jury.

387.    As part of the Post-Merger Transactions, Old DuPont transferred valuable assets to Corteva, Inc. and/or New DuPont (f/k/a DowDuPont) without receiving a reasonably equivalent value in exchange therefor when (i) Old DuPont engaged or was about to engage in a business or a transaction for which the remaining assets of Old DuPont were unreasonably small in relation to the business or transaction, and/or (ii) they intended Old DuPont to incur, or believed or reasonably should have believed that Old DuPont would incur, debts beyond its ability to pay as they became due.

388.    Through the Dow-DuPont Merger and the separations of New DuPont, Dow, Inc., and Corteva, Inc., Old DuPont sold or transferred, directly or indirectly, valuable assets and business lines to Corteva, Inc. and New DuPont.

389.    On information and belief, Corteva, Inc. and New DuPont assumed the liability of Old DuPont.

390.    The Post-Merger Transfers were made for the benefit of Corteva, Inc. and New DuPont.

391.    At the time that the Post-Merger Transactions were made, New DuPont was in a position to, and in fact did, control and dominate Old DuPont and Corteva.

392.    At the time that the Post-Merger Transactions were made, Old DuPont was engaged in or about to be engaged in a business where its remaining assets were unreasonably small in relation to its business.

393.    At the time that Post-Merger Transactions were made, New DuPont, Corteva, Inc., and/or Old DuPont believed or reasonably should have been believed that Old DuPont would incur debts beyond its ability to pay as they became due.

COMPLAINT

394.   New DuPont, Corteva, Inc., and Old DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties, who have been harmed as a result of these actions.

395.   The City has been harmed as a result of the Post-Merger Transactions.

396.   The City is entitled to avoid the Post-Merger Transactions, to recover property or value transferred from Old Dupont to New DuPont and/or Corteva, Inc., or to hold New DuPont and Corteva, Inc. jointly and severally liable for any damages or other remedies against Old DuPont that may be awarded by the Court or jury.

397.   Pursuant to Civil Code section 3439 *et seq.*, the City seeks, to the extent necessary to satisfy the City's claims, the attachment or other provisional remedy against the assets transferred to Old DuPont and the incurrence of obligations to Old DuPont in the Chemours Spin-Off, or the proceeds of assets now held by New DuPont and/or Corteva, Inc.

398.   The City further reserves such other rights and remedies that may be available under Civil Code section 3439 *et seq.*, and/or such other applicable state law as may be necessary to fully compensate the City.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

A.   an order in favor of the People requiring the AFFF Defendants, the DuPont Defendants, and Dynax to abate the public nuisance alleged herein, pursuant to Code of Civil Procedure section 731;

B.   an award of compensatory damages to the City according to proof including, but not limited to:

80

COMPLAINT

      i.     damages to compensate the City for injury to its properties and resources in which the City has legal rights or entitlements, including properties and resources held in trust;

      ii.     costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of PFAS contamination within Los Angeles and in the City's drinking water sources and properties;

      iii.     costs and expenses related to past, present, and future treatment and remediation of PFAS contamination within Los Angeles and in the City's drinking water sources;

      iv.     costs and expenses related to past, present, and future installation and maintenance of filtration systems to assess and evaluate PFAS within Los Angeles and in the City's drinking water sources; and

      v.     costs and expenses related to past, present, and future regulatory compliance activities;

C.     an award of consequential damages to the City;

D.     any other damages, including punitive or exemplary damages, as permitted by law;

E.     an order declaring that the assumption by Chemours Co. of the Assumed Liabilities did not relieve Old DuPont of its liability for the Assumed Liabilities to any extent;

F.     an order (i) compelling the return by Corteva, Inc. and New DuPont of all assets and other value received by them directly or indirectly from Old DuPont in the Post-Merger Transactions, or (ii) holding Corteva, Inc. and New DuPont jointly and severally liable with Old DuPont for all claims of Plaintiff against Old DuPont;

81

COMPLAINT

1         G.     an award of pre-judgment and post-judgment interest on all monies awarded, as

2    provided by law; and

3         H.     an order for all such other relief the Court deems just and proper.

4    <div align="center">**DEMAND FOR JURY TRIAL**</div>

5         Plaintiffs demand a trial by jury of all issues so triable as a matter of right.

6

7

8    Dated:  April 19, 2024               Respectfully submitted,

9    Hydee Feldstein Soto, City Attorney        **KELLER ROHRBACK L.L.P.**
     Kathleen A. Kenealy, Chief Assistant City Attorney

10   Michael J. Bostrom, Sr. Asst. City Attorney
     Jessica Brown, Asst. City Attorney

11   Office of the Los Angeles City Attorney       By: _____

12   By: _____       Matthew J. Preusch (SBN 298144)
                              801 Garden Street, Suite 301

13      *Attorneys for the Plaintiffs,*         Santa Barbara, CA 93101
        *The People of the State of California and*   Telephone: (805) 456-1496

14      *the City of Los Angeles*          mpreusch@kellerrohrback.com

15                            Gretchen Freeman Cappio
                              (*pro hac vice forthcoming*)

16                            Daniel P. Mensher
                              (*pro hac vice forthcoming*)

17                            Alison S. Gaffney
                              (*pro hac vice forthcoming*)

18                            Kathryn M. McCallum
                              (*pro hac vice forthcoming*)

19                            Rachel C. Bowanko (SBN 345717)

20                            1201 Third Avenue, Suite 3200
                              Seattle, WA 98101-3052

21                            Telephone: (206) 623-1900

22                            gcappio@kellerrohrback.com
                              dmensher@kellerrohrback.com

23                            agaffney@kellerrohrback.com
                              kmccallum@kellerrohrback.com

24                            rbowanko@kellerrohrback.com

25                            *Attorneys for Plaintiffs*

26

27

<div align="center">82</div>

COMPLAINT

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Matthew J. Preusch (SBN 298144)<br>801 Garden Street, Suite 301 Santa Barbara, CA 93101<br><br>TELEPHONE NO.: (805) 456-1496      FAX NO. :<br>EMAIL ADDRESS: mpreusch@kellerrohrback.com<br>ATTORNEY FOR *(Name):* The People of the State of California and the City of Los Angeles | **Electronically FILED by**<br>**Superior Court of California,**<br>**County of Los Angeles**<br>**4/22/2024 4:36 PM**<br>**David W. Slayton,**<br>**Executive Officer/Clerk of Court,**<br>**By M. Aguirre, Deputy Clerk** |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, California 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
The People of the State of California, et al, v. 3M Company, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: |
|---|---|---|---|
| [x] **Unlimited** (Amount demanded exceeds $35,000) | [ ] **Limited** (Amount demanded is $35,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | 24STCV09939 |
| | | | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

   **Auto Tort**
   [ ] Auto (22)
   [ ] Uninsured motorist (46)
   **Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
   [ ] Asbestos (04)
   [ ] Product liability (24)
   [ ] Medical malpractice (45)
   [ ] Other PI/PD/WD (23)
   **Non-PI/PD/WD (Other) Tort**
   [ ] Business tort/unfair business practice (07)
   [ ] Civil rights (08)
   [ ] Defamation (13)
   [ ] Fraud (16)
   [ ] Intellectual property (19)
   [ ] Professional negligence (25)
   [ ] Other non-PI/PD/WD tort (35)
   **Employment**
   [ ] Wrongful termination (36)
   [ ] Other employment (15)

   **Contract**
   [ ] Breach of contract/warranty (06)
   [ ] Rule 3.740 collections (09)
   [ ] Other collections (09)
   [ ] Insurance coverage (18)
   [ ] Other contract (37)
   **Real Property**
   [ ] Eminent domain/Inverse condemnation (14)
   [ ] Wrongful eviction (33)
   [ ] Other real property (26)
   **Unlawful Detainer**
   [ ] Commercial (31)
   [ ] Residential (32)
   [ ] Drugs (38)
   **Judicial Review**
   [ ] Asset forfeiture (05)
   [ ] Petition re: arbitration award (11)
   [ ] Writ of mandate (02)
   [ ] Other judicial review (39)

   **Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
   [ ] Antitrust/Trade regulation (03)
   [ ] Construction defect (10)
   [ ] Mass tort (40)
   [ ] Securities litigation (28)
   [x] Environmental/Toxic tort (30)
   [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
   **Enforcement of Judgment**
   [ ] Enforcement of judgment (20)
   **Miscellaneous Civil Complaint**
   [ ] RICO (27)
   [ ] Other complaint *(not specified above)* (42)
   **Miscellaneous Civil Petition**
   [ ] Partnership and corporate governance (21)
   [ ] Other petition *(not specified above)* (43)

2. This case [x] is   [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [x] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [x] Substantial amount of documentary evidence
   d. [x] Large number of witnesses
   e. [x] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [x] monetary   b. [x] nonmonetary; declaratory or injunctive relief   c. [x] punitive
4. Number of causes of action *(specify):* Six Causes of Action
5. This case [ ] is   [x] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: April 22, 2024
Matthew J. Preusch

| | ► |
|---|---|
| (TYPE OR PRINT NAME) | (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY) |

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10 |
|---|---|---|

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET
**CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice– Physicians & Surgeons
    Other Professional Health Care Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip and fall)
    Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
    Intentional Infliction of Emotional Distress
    Negligent Infliction of Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
    Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/ Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court Case Matter
    Writ–Other Limited Court Case Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-harassment)*
    Mechanics Lien
    Other Commercial Complaint Case *(non-tort/non-complex)*
    Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late Claim
    Other Civil Petition

| SHORT TITLE | CASE NUMBER |
|---|---|
| The People of the State of California, et al. v. 3M Company, et al. | 24STCV09939 |

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Courthouse Location (Column C) | |
|---|---|
| 1.   Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7.   Location where petitioner resides. |
| 2.   Permissive filing in Central District. | 8.   Location wherein defendant/respondent functions wholly. |
| 3.   Location where cause of action arose. | 9.   Location where one or more of the parties reside. |
| 4.   Location where bodily injury, death or damage occurred. | 10.   Location of Labor Commissioner Office. |
| 5.   Location where performance required, or defendant resides. | 11.   Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection). |
| 6.   Location of property or permanently garaged vehicle. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ 2201 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| **Other Personal Injury/ Property Damage/ Wrongful Death** | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 4 |
| | | ☐ 2306 Intentional Conduct – Sexual Abuse Case (in any form) | 1, 4 |

LASC CIV 109 Rev. 01/23

For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC Local Rule 2.3

| SHORT TITLE | CASE NUMBER |
|---|---|
| The People of the State of California, et al. v. 3M Company, et al. | 24STCV09939 |

| | | **A**<br>Civil Case Cover Sheet Case Type | **B**<br>Type of Action<br>(check only one) | **C**<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|---|
| **Other Personal Injury/ Property Damage/ Wrongful Death** | | | ☐ 2307 Construction Accidents | 1, 4 |
| | | | ☐ 2308 Landlord – Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 4 |
| | | Product Liability (24) | ☐ 2401 Product Liability (not asbestos or toxic/ environmental) | 1, 4 |
| | | | ☐ 2402 Product Liability – Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | | Medical Malpractice (45) | ☐ 4501 Medical Malpractice – Physicians & Surgeons | 1, 4 |
| | | | ☐ 4502 Other Professional Health Care Malpractice | 1, 4 |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | | Civil Rights (08) | ☐ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | | Professional Negligence (25) | ☐ 2501 Legal Malpractice | 1, 2, 3 |
| | | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | | Other (35) | ☐ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| **Employment** | | Wrongful Termination (36) | ☐ 3601 Wrongful Termination | 1, 2, 3 |
| | | Other Employment (15) | ☐ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | | ☐ 1502 Labor Commissioner Appeals | 10 |
| **Contract** | | Breach of Contract / Warranty (06) (not insurance) | ☐ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | | ☐ 0602 Contract/Warranty Breach – Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | | ☐ 0604 Other Breach of Contract/Warranty (no fraud/ negligence) | 1, 2, 5 |
| | | | ☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental Debt) | 2, 5 |
| | | Collections (09) | ☐ 0901 Collections Case – Seller Plaintiff | 5, 6, 11 |
| | | | ☐ 0902 Other Promissory Note/Collections Case | 5, 11 |
| | | | ☐ 0903 Collections Case – Purchased Debt (charged off consumer debt purchased on or after January 1, 2014) | 5, 6, 11 |
| | | | ☐ 0904 Collections Case – COVID-19 Rental Debt | 5, 11 |
| | | Insurance Coverage (18) | ☐ 1801 Insurance Coverage (not complex) | 1, 2, 5, 8 |

LASC CIV 109 Rev. 01/23

For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM<br>AND STATEMENT OF LOCATION**

LASC Local Rule 2.3

| SHORT TITLE | CASE NUMBER |
|---|---|
| The People of the State of California, et al. v. 3M Company, et al. | 24STCV09939 |

| | **A**<br>Civil Case Cover Sheet Case Type | **B**<br>Type of Action<br>(check only one) | **C**<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Contract** (Continued) | Other Contract (37) | ☐ 3701 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ 3702 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ 3703 Other Contract Dispute (not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/ Inverse Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation<br><br>Number of Parcels _____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure | 2, 6 |
| | | ☐ 2602 Quiet Title | 2, 6 |
| | | ☐ 2603 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer – Commercial (31) | ☐ 3101 Unlawful Detainer – Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Residential (32) | ☐ 3201 Unlawful Detainer – Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post Foreclosure (34) | ☐ 3401 Unlawful Detainer – Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer – Drugs (38) | ☐ 3801 Unlawful Detainer – Drugs | 2, 6, 11 |
| **Judicial Review** | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ 1101 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ – Administrative Mandamus | 2, 8 |
| | | ☐ 0202 Writ – Mandamus on Limited Court Case Matter | 2 |
| | | ☐ 0203 Writ – Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| The People of the State of California, et al. v. 3M Company, et al. | 24SCTV09939 |

| | | **A**<br>Civil Case Cover Sheet Case Type | **B**<br>Type of Action<br>(check only one) | **C**<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|---|
| **Provisionally Complex Litigation** (Continued) | | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | | Toxic Tort Environmental (30) | ☑ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | | ☐ 4203 Other Commercial Complaint Case (non-tort/noncomplex) | 1, 2, 8 |
| | | | ☐ 4204 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |
| | | | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | | ☐ 4304 Election Contest | 2 |
| | | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | | ☐ 4307 Other Civil Petition | 2, 9 |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

| SHORT TITLE<br>The People of the State of California, et al. v. 3M Company, et al. | CASE NUMBER   24STCV09939 |
|---|---|

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address, which is the basis for the filing location including zip code. (No address required for class action cases.)

| REASON:<br>☐ 1. ☐ 2. ☑ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11 | ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street |
|---|---|
| CITY:<br>Los Angeles | STATE:<br>California | ZIP CODE:<br>90112 | |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the ___Central___ District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated: _04/22/2024_____

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (01/23).
5. Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.
6. A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.

 **Superior Court of California, County of Los Angeles**

---

## ALTERNATIVE DISPUTE RESOLUTION (ADR)
## INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

---

### What is ADR?
ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration, and settlement conferences. When ADR is done by phone, videoconference or computer, it may be called Online Dispute Resolution (ODR). These alternatives to litigation and trial are described below.

### Advantages of ADR
- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees, and witness fees.
- **Keeps Control** (with the parties): Parties choose their ADR process and provider for voluntary ADR.
- **Reduces Stress/Protects Privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

### Disadvantages of ADR
- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

### Main Types of ADR

1. **Negotiation:** Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:** In mediation, a neutral mediator listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all. Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may not be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

**How to Arrange Mediation in Los Angeles County**

Mediation for **civil cases** is voluntary and parties may select any mediator they wish. Options include:

a. **The Civil Mediation Vendor Resource List**
   If all parties in an active civil case agree to mediation, they may contact these organizations to request a "Resource List Mediation" for mediation at reduced cost or no cost (for selected cases).

   - **ADR Services, Inc.** Case Manager Elizabeth Sanchez, elizabeth@adrservices.com (949) 863-9800
   - **Mediation Center of Los Angeles** Program Manager info@mediationLA.org (833) 476-9145

**These organizations cannot accept every case and they may decline cases at their discretion.** They may offer online mediation by video conference for cases they accept. Before contacting these organizations, review important information and FAQs at www.lacourt.org/ADR.Res.List

**NOTE: The Civil Mediation Vendor Resource List program does not accept family law, probate or small claims cases.**

b. **Los Angeles County Dispute Resolution Programs**
   https://hrc.lacounty.gov/wp-content/uploads/2020/05/DRP-Fact-Sheet-23October19-Current-as-of-October-2019-1.pdf

   Day of trial mediation programs have been paused until further notice.

   **Online Dispute Resolution (ODR).** Parties in small claims and unlawful detainer (eviction) cases should carefully review the Notice and other information they may receive about (ODR) requirements for their case.

c. Mediators and ADR and Bar organizations that provide mediation may be found on the internet.

3. **Arbitration:** Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit http://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC):** MSCs are ordered by the Court and are often held close to the trial date or on the day of trial. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit http://www.lacourt.org/division/civil/C10047.aspx

Los Angeles Superior Court ADR website: http://www.lacourt.org/division/civil/C10109.aspx
For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm